PEOPLE v ANDERSON

OPINION OF THE COURT

1. CRIMINAL LAW—LINEUP—IDENTIFICATION—ATTORNEY AND CLIENT
—HEARING—EVIDENCE.

Unless and until there is appropriate legislation or executive
action, where a lineup is held without counsel, any subsequent
in-court identification must be preceded by an evidentiary
hearing out of the presence of the jury at which the prosecu-
tion must show by clear and convincing evidence that the in-
court identification has a basis independent of the illegal
lineup.

2. CRIMINAL LAW—EVIDENCE—CONSTITUTIONAL RIGHTS—VERDICT—
HARMLESS ERROR.

A conviction must be reversed if evidence has been improperly
admitted in violation of constitutional rights, unless it is deter-
mined beyond a reasonable doubt that such evidence did not
affect the verdict; this is the so-called "harmless error" rule.

3. CRIMINAL LAW—PRETRIAL IDENTIFICATION—ATTORNEY AND CLIENT
—DUE PROCESS—HEARING—EVIDENCE—NEW TRIAL—VERDICT—
RECORD—REMAND.

The following pretrial identification rules have been developed by

REFERENCES FOR POINTS IN HEADNOTES

[1, 3, 4, 8, 9, 13] 21 Am Jur 2d, Criminal Law §§ 313, 318.

29 Am Jur 2d, Evidence § 371 *et seq.*

Admissibility of evidence as to extrajudicial or pretrial identifica-
tion. 71 ALR2d 449.

[2] 5 Am Jur 2d, Appeal and Error § 791.

[3, 8, 9] Admissibility of evidence of lineup identification as affected by
allegedly suggestive lineup procedures. 39 ALR3d 487.

[5] 20 Am Jur 2d, Courts §§ 183 *et seq.,* 195.

[6] 29 Am Jur 2d, Evidence § 371.

30 Am Jur 2d, Evidence § 1143.

[7, 14] 29 Am Jur 2d, Evidence § 367 *et seq.*

[10, 12, 16, 18] 29 Am Jur 2d, Evidence §§ 485, 785 *et seq.*

[11, 12] 21 Am Jur 2d, Criminal Law § 313.

[15] 21 Am Jur 2d, Criminal Law § 240.

[17] 58 Am Jur, Witnesses § 865.

the United States Supreme Court: (1) defendant is entitled to counsel at pretrial identification procedures; (2) unnecessarily suggestive and conducive to irreparable misidentification procedures deny due process; (3) if there was no counsel at the pretrial identification or if the procedures were unnecessarily suggestive or conducive to irreparable misidentification, then before an *in-court* identification may be received in evidence, the trial court must hold an evidentiary hearing out of the presence of the jury at which the people must show by clear and convincing evidence that the in-court identification had a basis independent of the prior identification procedure; (4) direct testimonial evidence relating to the pretrial out-of-court identification is per se excluded; (5) on appeal, if the Court finds that the evidence was erroneously admitted under the above standards, the Court must reverse the conviction and order a new trial unless it is able to declare beyond a reasonable doubt that the in-court identification did not affect the verdict; (6) if the record is not complete and a determination either way cannot be made, the Court should vacate the conviction and remand to the trial court for a hearing on the issue.

4. CRIMINAL LAW—IDENTIFICATION—HEARING—ATTORNEY AND CLIENT —DISCRETION.

The holding of an evidentiary hearing, out of the presence of the jury at which the people must show by clear and convincing evidence that the in-court identification had a basis independent of the prior identification procedure is *not* discretionary with the trial judge if there was no counsel at the pretrial identification or if the procedures were unnecessarily suggestive or conducive to irreparable misidentification.

5. APPEAL AND ERROR—COURTS—PRECEDENT—ATTORNEY AND CLIENT —IDENTIFICATION PROCEDURES.

Michigan Supreme Court is not permitted to follow decision of United States Supreme Court as authoritative precedent on question of counsel since there is no agreement by a majority of that Court regarding the limitation of right to counsel at preindictment out-of-court corporeal identification procedures; the clear rule in Michigan is that a majority of the Court must agree on a ground for decision in order to make that binding precedent for future cases; if there is merely a majority for a particular result, then the parties to the case are bound by the judgment but the case is not authority beyond the immediate parties.

6. CRIMINAL LAW—WITNESSES—EYEWITNESS IDENTIFICATION.

Four factors are involved in eyewitness identification in criminal cases: (1) the natural and usually necessary reliance on eyewitness identification of defendants by the police and prosecution; (2) the scientifically and judicially recognized fact that there are serious limitations on the reliability of eyewitness identification of defendants; (3) the scientifically and judicially recognized fact that frequently employed police and prosecution procedures often, and frequently unintentionally, mislead eyewitnesses into misidentification of the defendant; (4) the historical and legal fact that a significant number of innocent people have been convicted of crimes they did not commit and the real criminal was left at large.

7. CRIMINAL LAW—WITNESSES—EYEWITNESS IDENTIFICATION.

The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification.

8. CRIMINAL LAW—WITNESSES—PRETRIAL IDENTIFICATION.

A major factor contributing to the high incident of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification.

9. EVIDENCE—EYEWITNESS IDENTIFICATION.

There are serious problems concerning the accuracy of eyewitness identification of persons and real prospects for error inhere in the very process of identification completely independent of the subjective accuracy, completeness or good faith of witnesses.

10. CRIMINAL LAW—EYEWITNESS IDENTIFICATION—PHOTOGRAPHS—ATTORNEY AND CLIENT.

Eyewitness identification through photographs is at least as hazardous as corporeal identification and probably is more hazardous to the securing of correct identifications; subject to certain exceptions, identification by photograph should not be used where the accused is in custody and where there is a legitimate reason to use photographs for identification of an in-custody accused, he has the right to counsel as much as he would for corporeal identification procedures.

11. CRIMINAL LAW—EYEWITNESS IDENTIFICATION—WAIVER—ATTORNEY AND CLIENT.

Among the recognized *justifications* for absence of counsel at eyewitness identification procedures are: (1) "intelligent" waiver of counsel by the accused; (2) emergency situations

requiring immediate identification; (3) prompt, "on-the-scene" *corporeal* identifications within minutes of the crime.

12. CRIMINAL LAW—PHOTOGRAPHS—ATTORNEY AND CLIENT—LINEUP.

Although defendant was in custody before a photo identification took place, the failure to have counsel present falls within a well-recognized exception—there was *necessity* for an immediate identification since the victim was critically ill in the hospital's intensive care unit and because of the hour and other facts it was not possible to arrange an immediate lineup.

13. CRIMINAL LAW—IDENTIFICATION PROCEDURES—WITNESSES.

Identification procedures that are suggestive and conducive to irreparable misidentification operate upon the unconscious recognition process of the witness and create a likelihood that there will be a misidentification irrespective of the degree of previous acquaintanceship between the witness and the culprit and irrespective of the opportunity to observe during the commission of the crime.

14. CRIMINAL LAW—IDENTIFICATION—EVIDENCE.

In-court identification of defendant, an Indian, by the victim was accurate in spite of the employment of grossly suggestive pretrial identification procedures calculated to prompt an identification of whatever Indian was pictured because there was an independent basis established by clear and convincing evidence of the victim's knowledge before the suggestion took place and the victim had a previous acquaintance with defendant.

15. CRIMINAL LAW—SHACKLING DEFENDANT—JURY—PREJUDICIAL ERROR.

A defendant may be prejudiced in the eyes of the jury by being shackled and manacled in their presence; however, there was no prejudicial error where a jury was taken to a parking lot to view complainant's and defendant's automobiles and the jury arrived at the parking lot before the handcuffs could be removed from defendant who was placed in the back of an automobile with his hands bound behind him; it was unlikely the jury was able to see that defendant was handcuffed, removing the handcuffs at that time would have only drawn attention to the situation, defendant was outside the confines of the courthouse, increasing the possibility of escape, and such restraint was justifiable.

16. CRIMINAL LAW—EVIDENCE—PHOTOGRAPHS—REVERSIBLE ERROR—DISCRETION.

Admitting photographic slides depicting the condition of a victim

of assault with intent to murder while being treated at the hospital was not reversible error or an abuse of discretion.

17. WORDS AND PHRASES—RECALL—RECOGNITION—REMEMBERING— CRIMINAL LAW—IDENTIFICATION.

"Recall" and "Recognition" are distinct forms of remembering; "Recall" is a straightforward proposition in which there are only very limited "cues" available to aid memory and the range of possible responses eliminates any significance in guessing; "Recognition" memory, on the other hand, arises *only* where useful memory cues do exist and the job is to make a "right" choice, or "reasoned" guess between the presented alternatives; identification of suspects is a form of "recognition memory" involving an element of choice.

CONCURRING OPINION

T. E. BRENNAN, J.

18. CRIMINAL LAW—IDENTIFICATION—EVIDENCE—PHOTOGRAPHS.

*Permitting an in-court identification of defendant to be made, despite evidence that defendant was the only Indian among six persons whose photographs were shown to the victim at the hospital, was not error where the victim was acquainted with her assailant, described him to the police, and was in critical condition in the hospital; this is the rule of law in the case.*

Appeal from Court of Appeals, Division 3, Fitzgerald, P. J., and Quinn and McIntyre, JJ., affirming Midland, James R. Rood, J. Submitted March 9, 1972. (No. 4 March Term 1972, Docket No. 53,247.) Decided March 27, 1973.

29 Mich App 578 affirmed.

Franklin Anderson was convicted of assault with intent to commit murder. Defendant appealed to the Court of Appeals. Affirmed. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Edward G. Durance,*

Prosecuting Attorney, and *Robert G. Fraser,* Chief
Assistant Prosecuting Attorney, for the people.

*Sinclair, Edwards & Clulo,* for defendant on
appeal.

WILLIAMS, J. This is a very complicated case. A
woman was brutally raped and murder attempted.
After the woman was found in critical condition
she was questioned at the hospital by various
persons as to the identity of her assailant. Based
on that information, a suspect was arrested and a
polaroid shot taken of him. This polaroid along
with a number of "mug shots" was under various
times and circumstances shown to the victim. In
each case she identified the defendant.

The heart of the prosecution's case was identifi-
cation of the defendant by the victim. At trial
defendant objected to identification being made by
the victim on the basis of *United States v Wade*
and successor cases[1] because of the character of
the photo showup and because there had been no
lawyer present at the photo showups. The issue in
the case therefore is what the requirements of
*Wade* and successor cases are and whether they
were satisfied by the facts in this case.

. This opinion will review I. The Detailed Facts,
II. The *Wade* Rules, III. The Psychological Basis
for *Wade,* IV. The Application of *Wade* to Photo-
graphic Identification Procedures in Michigan, V.
Application of Rules to the Facts of this Case, VI.
Minor Issues, Conclusion.

[1] 388 US 218; 87 S Ct 1926; 18 L Ed 2d 1149 (1967); *Gilbert v
California,* 388 US 263; 87 S Ct 1951; 18 L Ed 2d 1178 (1967); *Stovall
v Denno,* 388 US 293; 87 S Ct 1967; 18 L Ed 2d 1199 (1967); *Simmons
v United States,* 390 US 377; 88 S Ct 967; 19 L Ed 2d 1247 (1968);
*Kirby v Illinois,* 406 US 682; 92 S Ct 1877; 32 L Ed 2d 411 (1972).

## I. —DETAILED FACTS

## IDENTIFICATION ISSUES

This crime involves a savage assault on a bar waitress with intent to commit murder. The victim had seen the defendant four or five times at the bar where she worked. On the night of the assault, the victim had seen but was not with the defendant in the bar. The accused left the bar prior to the "last call". The victim left with a Mr. Whitman after closing and had "coffee" with him at her home until 3:30 when she left to see another male friend. Mr. Whitman said he saw a red car with fins and no headlights containing only the driver execute a U-turn and then follow the victim.

En route, the victim testified she stopped or was stopped. Thereafter she was personally struck, driven away in a red car with fins, and later assaulted. People's proofs included evidence of the victim's fingerprints on defendant's car, blood of her type on the car's seat and matching paint smears in damaged areas on the victim's and defendant's cars. There was also testimony placing the defendant and his car at a gas station near the victim's home just after 2 a.m.

## PRE-SURGERY

When found injured in a field the following morning, an ambulance was called and the ambulance driver, while preparing the victim for transport to the hospital, asked whether she had been in an accident and the victim responded "uh uh" (no); whether she had been beaten—"uh huh" (yes); whether she had been raped—"uh huh" (yes). The victim was taken to Midland Hospital.

Deputy Sheriff Gransden had been at the scene and followed the ambulance back to the hospital and was in the emergency room while the victim was being examined before surgery. He questioned her and her responses were by nodding her head "yes" or "no" and by writing on the back of a surgical glove envelope. She nodded "no" when asked if she knew assailant's name. She wrote her name on a pad. Asked again about the assailant she wrote "he comes in where I work. Aladdin Bar Bay City". The victim was taken to X-ray before surgery.

Present in the X-ray room were a nurse and the ambulance driver. The ambulance driver questioned the victim about her assailant further and her responses were by nodding her head "yes" or "no". He asked whether he were white—"no"; colored—"no"; Mexican—"no"; Indian?—here she responded by voice and had to say the word several times before the ambulance driver and the nurse present both understood. The word was "Indian":

"It was a positive, she said Indian and she was very affirmative about the negatives (referring to white, colored, etc.) if you understand what I mean. She shook her head as best she could when I asked the questions."

The ambulance driver continued to ask whether the assailant had brown hair?—"no"; black hair?—"yes"; whether they had been friends?—"no".

## POST SURGERY MEETING 8:15 P.M.

The victim was taken to surgery sometime after the questioning in the X-ray room and there was no further communication with her until 8:15 that evening after surgery in her hospital room. Pres-

ent for the questioning were Deputy Sheriff Grans-
den, Sheriff's Matron Theisen, the prosecutor and
a nurse. The victim was unable to talk but could
nod her head and give gestures with her hands.
Matron Theisen was there to take notes and later
testified as to the questioning. Deputy Sheriff
Gransden went through a series of names picked
at random (including defendant's name) to see if
she could pick out any certain name. (Frederick,
James, Jim.) She was also asked "Anderson" but
the record is unclear as to her response to that.
When the name "Frank" was mentioned there was
a definite response and she waved her hands
around. Asked if she saw the car she nodded "yes".
Asked whether attacked in her car she shook her
head no. Asked whether it was a pickup truck she
shook her head no. She nodded yes when asked if
it was a car. Deputy Gransden then went through
four colors of cars, blue, black, white, red. She
nodded yes to red. Deputy Gransden went through
the different makes of cars and when he men-
tioned "Dodge" she indicated yes. Apparently by
the same process it was established that the assail-
ant was in the neighborhood of 6 feet, some-
where around 200 pounds and an Indian. Asked
whether she could identify the person who at-
tacked her she nodded her head "yes". There were
no pictures shown to the victim at this 8:15 meet-
ing.

## POST SURGERY MEETING 11 P.M.—FIRST PHOTO LINEUP

The defendant was arrested at about 9:30 p.m.
and between 10 and 10:30 a black-and-white polar-
oid photograph was taken of him by a Bay City
officer. Deputy Gransden drove to Bay City, picked
up the picture and returned to Midland, having

called ahead to have Matron Theisen select other
pictures from the files for a photo showup. Deputy
Gransden and Matron Theisen returned to the
victim's hospital room at 11 p.m. with six pictures,
including the polaroid of defendant.

Defendant's picture was a polaroid shot with
perforated edges and depicted a single head-on
view. The other five pictures were standard "mug
shots" depicting front and side views. Each picture
had prison numbers superimposed over the front
view and an arrest card was attached to each
picture except that of the defendant. Before being
shown the pictures, the victim was told there was
a suspect and his picture was included in those she
would be shown. The pictures were shown to the
victim individually with defendant's picture shown
last. The victim identified defendant as her assail-
ant.

## DAY AFTER SURGERY—SECOND PHOTO-
LINEUP

On the following day, the prosecutor conducted a
"lineup" with the same pictures shown individu-
ally in the same sequence. The victim again se-
lected defendant's photograph as pictorial identifi-
cation of her assailant.

## THREE DAYS PRIOR TO PRELIMINARY EXAM
—THIRD PHOTO-LINEUP

Three days prior to the preliminary examination
a third photo lineup was conducted by Officer
Whipple for the purported reason of making a
"positive identification". On this occasion the pho-
tos were given to her in folders.

Counsel had been appointed after the second

lineup but the third lineup was accomplished without notice to counsel. On this occasion there were 12 pictures shown her, all except that of defendant being front and side views while that of defendant was the same polaroid photograph shown earlier. Each photograph, including that of defendant, had paper covering the place where prison identification numbers could have been seen. On this occasion the victim again identified Anderson. Officer Whipple said the reason he made folders as described was that it would have been "suggestive" otherwise.

## TRIAL

Timely and continuous objections by defendant's counsel to the victim's in-court identification were made at the preliminary examination, pretrial motions and by oral trial objections. On the motion to suppress there was testimony by Dr. Russell Leach, a psychiatrist. A hypothetical question recited the facts up to and until the first photo show but excluded the fact that the victim had previously seen defendant in the bar numerous times. The doctor testified that it was "highly probable" that the first identification was suggestive; that as to the second identification it was "possible that it would be highly probable" to be suggestive. As to the in-court identification, however, the testimony is less clear:

"*Q.* And, some twenty days later, an in-court identification of the man as the man who had, in fact, attacked her, a man who she had seen time and again, a face she would never forget, would you say that this in-court identification was the product of suggestion?

"*A.* I don't believe I can say so, under those conditions; as that is twenty-three days later. I don't think I could apply suggestion."

## SECURITY PRECAUTIONS ISSUE

During testimony as to matching paint smears on the victim's and defendant's autos, the jury and the court moved to the courthouse parking lot where both cars were. To assure defendant's presence without creating prejudice the trial judge ordered the defendant be taken down to the parking lot before the jury came out, his handcuffs removed, and that he be put in a car with the window down. Apparently the jury came to the courthouse parking lot too soon, and, rather than make a display of removing the handcuffs, the officer placed the defendant in the rear seat of the automobile with his arms handcuffed behind his back.

## HOSPITAL PHOTOS ISSUE

Over objection of defendant four photos taken by the hospital for teaching purposes were introduced in evidence depicting the victim on the operating table. There had previously been oral testimony as to victim's condition.

Defendant claimed the only issue in the case was identification of the assailant and the photos were immaterial. On oral argument the people admit that the only purpose for using the photos was to show the victim's condition in order to establish that she would have died without treatment. They contend, however, that the trial judge did not abuse his discretion in admitting the pictures.

Defendant was found guilty by the jury and sentenced to life. The Court of Appeals affirmed, *People v Anderson,* 29 Mich App 578 (1971). We granted leave, 384 Mich 838 (1971), primarily to

consider the issues relating to eyewitness identification.

## II. THE *WADE* RULES

In *United States v Wade,* 388 US 218; 87 S Ct 1926; 18 L Ed 2d 1149 (1967), the United States Supreme Court in a "post-indictment" case held that, because of the established dangers of irreparable misidentification coupled with the inability to accurately reconstruct what happens at corporeal lineups, an accused in a Federal prosecution is entitled to counsel at a pretrial lineup in order to protect his right to meaningfully cross-examine the identifying witness at trial. Unless and until there is appropriate legislation or executive action, where a lineup is held without counsel, any subsequent in-court identification must be preceded by an evidentiary hearing out of the presence of the jury at which the prosecution must show by clear and convincing evidence that the in-court identification has a basis independent of the illegal lineup.

In *Gilbert v California,* 388 US 263; 87 S Ct 1951; 18 L Ed 2d 1178 (1967), in a "post-indictment" case the Court, applying *Wade* to a state prosecution, held as above regarding in-court identifications and held further that where the corporeal lineup was had without counsel, any direct evidence relating to the prior, pretrial lineup identification is per se inadmissible. Thus, *Wade,* which only required a foundation for admissibility of identification evidence, was extended to a separate class of "hearsay" evidence to provide a per se exclusionary rule *regardless of adequate foundation.* If evidence has been improperly admitted in violation of constitutional rights, a conviction must be reversed unless it is determined beyond a rea-

sonable doubt that such evidence did not affect the verdict.[2]

In *Stovall v Denno,* 388 US 293; 87 S Ct 1967; 18 L Ed 2d 1199 (1967), the Court held in a "preindictment" case that although *Wade* was not to be retroactive in its application, there was an independent ground of constitutional attack where the procedures used are so unnecessarily suggestive and conducive to irreparable mistaken identification that it amounts to a denial of due process.

In *Simmons v United States,* 390 US 377; 88 S Ct 967; 19 L Ed 2d 1247 (1968), the principles of *Stovall* were applied to the identification by photograph of an unapprehended suspect. The Court noted that the right to counsel was not raised but recognized the dangers in photographic identification. Because of the widespread and effective use of initial identification by photograph from the standpoint of apprehending offenders and avoiding needless arrests of innocent suspects, however, the Court was unwilling to *prohibit* altogether the *initial* identification of unapprehended suspects by photograph but would subject all such permissible photographic identification to the *Stovall* standard of due process. Consequently, the Court said that convictions based on eyewitness identification at trial following initial identification by photograph would be set aside on that ground only if the procedures used were so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

These cases develop the following pretrial identification rules:

1. Defendant is entitled to counsel at pretrial identification procedures *(Wade).*

---

[2] This is the so-called "harmless error" rule enunciated in *Chapman v California,* 386 US 18; 87 S Ct 824; 17 L Ed 2d 705 (1967).

2. Unnecessarily suggestive and conducive to irreparable misidentification procedures deny due process *(Stovall)*.

3. If there was no counsel at the pretrial identification or if the procedures were unnecessarily suggestive or conducive to irreparable misidentification, then before an *in-court* identification may be received in evidence, the trial court must hold an evidentiary hearing out of the presence of the jury at which the people must show by clear and convincing evidence that the in-court identification had a basis independent of the prior identification procedure *(Wade)*.[3]

4. Direct testimonial evidence relating to the pretrial out-of-court identification is per se excluded *(Gilbert)*.[4]

5. On appeal, if the Court finds that the evidence was erroneously admitted under the above standards, the Court must reverse the conviction and order a new trial unless it is able to declare beyond a reasonable doubt that the in-court identification did not affect the verdict.[5]

6. If the record is not complete and a determination either way cannot be made, the Court should vacate the conviction and remand to the trial court for a hearing on the issue.[6]

In passing it should be said that the per se exclusionary rule of *Gilbert* (#4 above) is not here at issue, because no direct testimony was intro-

---

[3] The holding of this evidentiary hearing is *not* discretionary with the trial judge. See, *e.g., People v Childers,* 20 Mich App 639, 646 (1969); *People v Hutton,* 21 Mich App 312, 325 (1970); *People v Riley,* 33 Mich App 721, 731 (1971) (LEVIN, J., dissenting).

[4] *Gilbert,* 273; *Foster v California,* 394 US 440; 89 S Ct 1127; 22 L Ed 2d 402 (1969).

[5] *Wade,* 242; *Gilbert,* 274; *Chapman v California,* 386 US 18; 87 S Ct 824; 17 L Ed 2d 705 (1967).

[6] *Gilbert,* 274; *Foster v California, supra,* fn 5, 444.

duced by the people in *Anderson* as to the pretrial out-of-court photographic identification of the defendant. As the statement of facts shows, however, all of the information did come in on cross-examination by defendant.[7]

*Kirby v Illinois,* 406 US 682; 92 S Ct 1877; 32 L Ed 2d 411 (1972), modifies only part of the per se exclusionary rule of *Gilbert.* In a *plurality opinion* the per se exclusionary rule was held not to apply to testimony concerning *"pre-indictment" out-of-court corporeal identification procedures.* Since there is no agreement by a majority of the United States Supreme Court regarding the limitation of right to counsel in *Kirby,* we are not permitted to follow *Kirby* as authoritative precedent on the question of counsel. The clear rule in Michigan is that a majority of the Court must agree on a ground for decision in order to make that binding precedent for future cases. If there is merely a majority for a particular result, then the parties to the case are bound by the judgment but the case is not authority beyond the immediate parties. See *Hileman v Indreica,* 385 Mich 1, 7, fn 1 (1971); *In re Curzenski Estate,* 384 Mich 334, 335, fn 1 (1971); *Breckon v Franklin Fuel Co,* 383 Mich 251, 278–279 (1970); *Kalamazoo v Crawford,* 154 Mich 58, 60 (1908); *Corporation & Securities Commission v McLouth Steel Corp,* 7 Mich App 410, 412 (1967); *Corporation & Securities Commission v American Motors Corp,* 4 Mich App 65, 67 (1966); 7 Michigan Law & Practice, Courts, §§ 51–53 and cases cited.

The same rules of decision govern the permissible construction by states of decisions of the United States Supreme Court. In *United States v*

---

[7] The question of whether testimony as to out-of-court identifications is admissible *at all* under particular circumstances as an exception to the hearsay rule in Michigan was considered in *People v Poe,* 388 Mich 611 (1972).

*Pink,* 315 US 203, 216; 62 S Ct 552; 86 L Ed 796
(1942), the rule is well summarized as follows:

"[T]he lack of agreement by a majority of the Court
on the principles of law involved prevents it [a case
claimed to be determinative of *Pink]* from being an
authoritative determination for other cases."[8]

Applying these well-settled constructional man-
dates to *Kirby* we see that a majority of the Court
agreed on a result only, that the per se exclusion-
ary rule of *Gilbert* did not apply to the case before
them. There was no "opinion of the Court", but
the "judgment" of the Court was to affirm the
Illinois Court of Appeals. The most liberal con-
struction of these rules might suggest that the
*Kirby* case "holds" that the per se *exclusionary
rule* of *Gilbert* does not apply in *"pre-indictment"*
cases.[9] Constitutional rules of construction do not
permit us to read *Kirby* as abrogating the pre-
indictment requirements for counsel and the other
rules of *Wade, Gilbert, Stovall* and *Simmons,* by
all of which we are still bound.

This Court and the Court of Appeals have both
consistently applied the *Wade* requirements to
*"pre-indictment" corporeal identification proce-
dures.* See *People v Schumacher,* 29 Mich App 594
(1971), *rev'd,* 384 Mich 831 (1971); *People v Ranes,*

---

[8] See also *Boyle v Zacharie,* 31 US (6 Pet) 348; 8 L Ed 423 (1832);
*Hertz v Woodman,* 218 US 205; 30 S Ct 621; 54 L Ed 1001 (1910); 21
CJS, Courts, § 184; 20 Am Jur 2d, Courts, § 195.

[9] Personally, this writer would prefer to see *Gilbert's* per se exclu-
sionary rule of testimony relating to pretrial identification vacated
*entirely* but with the continuation of the present requirements of a
pre-qualification of testimony with a foundation of the fairness of the
procedures. Psychologically and logically, the testimony of the identif-
ying witness at a point of time much nearer the criminal event and
under better controlable circumstances than picking out the defend-
ant from his normal place in court is apt to be more accurate. See P.
Wall, *Eye-Witness Identification in Criminal Cases,* 26–27, p 181, fn 2
and Chapter V (1971, 2d printing).

385 Mich 234, 242 (1971); *People v Hutton,* 21 Mich App 312, 320 ff (1970).

## III. —PSYCHOLOGICAL PRINCIPLES

The psycho-legal fundamentals in this case derive from the tension between four factors involved in eyewitness identification in criminal cases. The four factors are:

1. The natural and usually necessary reliance on eyewitness identification of defendants by the police and prosecution;
2. The scientifically and judicially recognized fact that there are serious limitations on the reliability of eyewitness identification of defendants;
3. The scientifically and judicially recognized fact that frequently employed police and prosecution procedures often (and frequently unintentionally) mislead eyewitnesses into misidentification of the defendant;
4. The historical and legal fact that a significant number of innocent people have been convicted of crimes they did not commit and the real criminal was left at large.

The first factor, the reliance on eyewitness identification of defendants by the police and prosecution, is too well understood to require review or comment. Since the United States Supreme Court has specifically recognized each of the other factors, this Court can reasonably take judicial notice of them.[10]

However, these four factors and the United States Supreme Court discussions based on them

---

[10] See *e.g., United States v Wade,* 388 US 218; 87 S Ct 1926; 18 L Ed 2d 1149 (1967) and authorities cited. Factor #2, 388 US 218, 228; factor #3, 388 US 218, 229, 234–235; factor #4, 388 US 218, 228. See also *Simmons v United States,* 390 US 377, 383–384; 88 S Ct 967; 19 L Ed 2d 1247 (1968).

have such widespread and deep-rooted impact on everyday police work, prosecution and criminal procedure rules that this opinion must briefly consider the scientific and historical data behind the last three factors in order to promote the fullest understanding and acceptance of the resulting rules of law.

For the purpose of our decision, rather than unduly extend this opinion with elaborate examination and documentation of the scientific support for the limitations on the reliability of eyewitness identification and the significant legal record of proven misidentification, we will discuss the matter only briefly. If, however, anyone has questions about these propositions or wants to study the scientific and historical background of these propositions further, the results of our research, particularly the extensive references and bibliography, are annexed to this opinion as Appendix A.

The second factor, the scientific fact that there are serious limitations on the reliability of eyewitness identification of defendants, was specifically recognized by the United States Supreme Court when it said:

"The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification." *Wade,* 228.

The conclusions of *Wade* rested on writings that depend either upon scientific analysis or the earlier works of scientists in the field which demonstrate the serious limitations of eyewitness identifications by the results of experiments. These results may at first blush be surprising but on just a little reflection make sense and fall right into line with everyday experience. Here follows a description of just one of many actual experiments and

the startling results which indicate that identification of individuals—however earnest—is often unreliable.

This experiment was conducted at Dartmouth College and was designed to evaluate the impact of even slight suggestibility in a "lineup" identification upon witnesses who were relatively sophisticated in nuances of psychology, Brown, *An Experience in Identification Testimony,* 25 J Crim L & C 621 (1934–1935).

By pre-arrangement and without warning, a workman entered a classroom in session, walked across it, paused in front of the instructor's desk, tinkered with the radiator, made an inquiry about the heat and finally left unobtrusively. The incident was treated casually by the instructor and none of the students were forewarned of the experiment.

After a lapse of two weeks, the workman was again brought into the class with five other workmen of the same general dress and appearance. "Lineups" were then conducted separately before four different groups of students who were asked to indicate their selection of the workman they had previously seen as well as their degree of confidence in this judgment.

1) The first group consisted of 30 persons studying legal psychology who were familiar with surprise psychological tests of this nature (many of them suspected a test when the man first walked in). Of this group 23 or 76.6% correctly identified the workman, 3 were unable to identify, 1 thought it was a hoax, 2 identified the wrong man, and 1 would have been willing to swear in court that the man was not in the lineup. One of the two who made the wrong identification also expressed his willingness to swear in court that his identification was correct.

2) The second group consisted of 64 students with no experience in "surprise" tests but some did suspect a test when the man first walked in. Of these, 42 or 65.6% made correct identifications but 11 or 17.1% were unable to make a correct identification.

3) The third group consisted of 16 random students. The questionnaire upon which they were to indicate their identification was worded to provide the slightest suggestion that the correct man was probably in the lineup *(e.g.,* "which of the men" rather than "are any of these men"). Only *five* men were shown to these students and the man who had actually entered the classroom was excluded from the lineup.

The amazing result is that *62.5% positively identified the wrong man.* Two persons were too unsure to make an identification and only four correctly stated that the original man was not in the lineup.

4) The fourth group of 17 students had not witnessed the original incident at all. While 12 correctly stated that they did not remember the incident, the remaining 29.4% "recalled" an incident that they had never witnessed and attempted to identify one of the men.[11]

---

[11] Many would suggest that the students would have more accurately identified the janitor if it had been a "crime" since the emotion and drama of the situation would have "impressed it on their minds". Although this assumption has wide credence among judges, it is uniformly rejected in scientific circles. See, *e.g.,* Anastasi, *Fields of Applied Psychology* (1964), p 548:

"Contrary to legal folklore, strong emotion at the time of observation or subsequent report tends to increase the probability of error."

For example, in another classroom experiment the students did witness a surprise "crime" in which three persons ran through the auditorium and engaged in a fight. The actual time was 90 seconds but estimates of time ranged from 1 minute to 15 minutes (mean estimate 5 minutes). The ranges of estimates of height, weight and age of each "criminal" ranged (respectively):

Actual legal cases support the same conclusion. For example, in one Massachusetts case 12 witnesses identified the wrong man as the culprit. See P. Wall, *Eye-Witness Identification in Criminal Cases* 12 (1965, 2nd printing 1971). The author references other examples of erroneous identification by 13, 14, and 17 witnesses noting that "these are by no means the most extreme examples * * * ." *Id.*

The classic British case of Adolph Beck resulted in a British Government Committee impaneled by royal command to present a report to Parliament. As the result of a complaint to the police by a prostitute that Beck was the man that had defrauded her, Adolph Beck was convicted and incarcerated. No sooner did he leave prison on the first charge than he was "fingered", convicted and imprisoned again in a similar incident. Years later the real culprit confessed after committing many more crimes. The British Government Committee in their report to Parliament reached the following conclusion:

"[E]vidence as to the identity based on personal impressions, however *bona fide,* is perhaps of all classes of evidence the least to be relied upon, and therefore, unless supported by other facts, an unsafe basis for the verdict of a jury."[12]

Despite the reputation the British have for no-

| | Criminal #1 | Criminal #2 | Criminal #3 |
|---|---|---|---|
| Height | 4'8" to 7' | 4'6" to 6'4" | 4'5" to 5'10" |
| Weight | 90 lbs—170 lbs | 100 lbs—160 lbs | 85 lbs—150 lbs |
| Age | 11 yrs—20 yrs | 12 yrs—19 yrs | 10 yrs—18 yrs |

See Vickery & Brooks, *Time-Space Reporting of a "Crime" Witnessed by College Girls*, 29 J Crim L, C & PS 371 (1938). And see discussion and references in Appendix A, pp 210–212.

[12] *Committee of Inquiry into the Case of Adolph Beck,* p vii (London, 1907); Watson, *Trial of Adolph Beck* (1924), p 250; P. Wall, *Eye-Witness Identification in Criminal Cases* 7 (1971 2nd printing); and see Borchard, *Convicting the Innocent* (1932).

nonsense handling of criminal cases, British law is so concerned with the fallibility of eyewitness identification and the possibility of unfounded accusations in rape cases that corroborating evidence is required by statute and case law in some cases. Even where it is not required, the courts insist upon instructions to the jury of the great dangers of such identifications, even if the complainant's evidence is clear and convincing.[13]

Pre-lineup display of photographs in any case is so distrusted in England that it has long been grounds for quashing the conviction. See *Rex v Haslom,* 19 Crim App R 59, 60; 134 LT R 158 (1925).

The third factor, the scientific fact that frequently employed police and prosecution procedures often mislead eyewitnesses into misidentification of defendants, was clearly recognized by Justice Brennan speaking for the United States Supreme Court when he wrote:

"A major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification. A commentator has observed that '[t]he influence of improper suggestion upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor—perhaps it is responsible for more such errors than all other factors combined.' Wall, Eye-Witness Identification in Criminal Cases 26." *Wade,* 228–229.

[13] See 7 Wigmore, Evidence (3d ed), § 2061, p 346, n 2; *Rex v Trigg,* 1 All E R 490 (CA, 1963). Whatever the merits of the rule in a particular case, it nevertheless indicates judicial awareness of the problem. The Court of Appeals of New York reluctantly reaffirmed the requirement of corroboration in rape cases in *People v Linzy,* 31 NY2d 99; 335 NYS2d 45; 286 NE2d 440 (1972). See also, *e.g., People v Rossililli,* 24 Ill 2d 341; 181 NE2d 114 (1962); *People v Stagg,* 29 Ill 2d 415; 194 NE2d 342 (1963).

Improper suggestion commonly comes about because of three things. First, the witness when called by the police or prosecution either is told or believes that the police have apprehended the right person. Second, if the witness is shown only one person or a group in which one person is singled out in some way, he is tempted to presume that he is the person. Third, as the second factor just discussed above shows, eyewitness identification has inherent weaknesses from the standpoint of the witness's problems of sensation, retention, etc., and the similarity in appearance of people.

The fourth factor, the historical and legal fact that all too many innocent people have been convicted of crimes they did not commit and the real criminal who committed the crime was consequently protected and left at large, was recognized by the United States Supreme Court in the quotation we set forth above but repeat here with the emphasis on the last clause:

> "The vagaries of eyewitness identification are well-known; *the annals of criminal law are rife with instances of mistaken identification." Wade*, 228. (Emphasis added.)[14]

In Borchard, *Convicting the Innocent* (1932), the author discusses some 50 of the best known cases of mistaken convictions. In the introduction the author singles out erroneous eyewitness identification as the one greatest source of error:

> "*Perhaps the major source of these tragic errors is an identification of the accused by the victim of a crime of violence.* This mistake was practically alone responsible

---

[14] See also Appendix A, pp 192–220. The distinguished jurist Jerome Frank was equally emphatic in his book *Not Guilty:*

"Perhaps erroneous identification of the accused constitutes the major cause of the known wrongful convictions." Frank & Frank, *Not Guilty* (1957), p 61.

for twenty-nine of these convictions. Juries seem disposed more readily to credit the veracity and reliability of the victims of an outrage than any amount of contrary evidence by or on behalf of the accused, whether by way of alibi, character witnesses, or other testimony. These cases illustrate the fact that the emotional balance of the victim or eyewitness is so disturbed by his extraordinary experience that his powers of perception become distorted and his identification is frequently most untrustworthy. * * * *How valueless are these identifications by the victim of a crime is indicated by the fact that in eight of these cases the wrongfully accused person and the really guilty criminal bore not the slightest resemblance to each other,* whereas in twelve other cases, the resemblance, while fair, was still not at all close. In only two cases can the resemblance be called striking." *Id,* xiii. (Footnotes omitted, emphasis added.)

A number of other authors have collected cases where there have been convictions based on mistaken eyewitness identification. See, *e.g.,* Du Cann, *Miscarriages of Justice* (1960); Frank & Frank, *Not Guilty* (1957); Gardner, *The Court of Last Resort* (1952); Hale, *Hanged in Error* (Penguin ed 1961); Ram, *A Treatise on Facts as Subjects of Inquiry by a Jury* (4th Amer ed 1890); Rolph, *Personal Identity* (1957); Wall, *Eye-Witness Identification in Criminal Cases* (1965); Watson, *The Trial of Adolph Beck* (1924); Wigmore, *The Science of Judicial Proof* § 254 (3d ed 1937); Wilder and Wentworth, *Personal Identification* (1918); Williams, *The Proof of Guilt* (3d ed 1963).

For a number of obvious reasons, however, including the fact that there is no on-going systematic study of the problem, the reported cases of misidentification are in every likelihood only the top of the iceberg. The writer of this opinion, for example, was able to turn up three very recent unreported cases right here in Michigan in the

course of a few hours' inquiry. (See the cases of Charles Clark, Lewis Nasir, and Charles Edward Richardson in Appendix A.)

The excerpted material above is intended only to suggest a flavor of the consistent findings by researchers. Briefly, we find that there are serious problems concerning the accuracy of eyewitness identification and that real prospects for error inhere in the very process of identification completely independent of the subjective accuracy, completeness or good faith of witnesses. For almost 100 years these problems have occupied the energy of some very astute judges, prosecutors and scholars who have consistently identified the problems. We cannot blink at the evidence of the problem and must make a forthright effort to insure that evidence of eyewitness identification is as reliable as possible.

## IV. THE APPLICATION OF *WADE* TO PHOTOGRAPHIC IDENTIFICATION PROCEDURES IN MICHIGAN

This Court has not heretofore ruled on the right to counsel at post-apprehension photographic showups. *People v King,* 384 Mich 310 (1970), dealt with corporeal identification following uncounseled identification by photograph but the question of the right to counsel was not presented. The question was resolved under the *Simmons-Stovall* standard of due process and avoidance of impermissibly suggestive procedures. *Id,* 313.

Our Court of Appeals, however, follows the rule that there is a right to have counsel present at a photographic identification of an accused who is in custody. See *People v Cotton,* 38 Mich App 763 (1972) overruling *People v Wilkins,* 36 Mich App 143 (1971); *People v Robert Thomas,* 36 Mich App

190, 193 (1971); *People v John Martin,* 37 Mich
App 621, 628 (1972); *People v Fossey,* 41 Mich App
174, 182 (1972). See also, *People v Rowell,* 14 Mich
App 190, 198 (1968) (concurring opinion of LEVIN,
J.); *People v Adams,* 19 Mich App 131, 133, n 1
(1969); *People v Greer,* 29 Mich App 203, 206
(1970).[15] We approve.

In *Cotton, supra,* defendant had been arrested
and two corporeal lineups were held with defend-
ant's counsel present. Both lineups produced iden-
tifications by both witnesses of persons *other* than
defendant. Defendant's car was impounded but
defendant was released. After his release one wit-
ness identified defendant from a group of pictures
shown her by the police without counsel present.
Defendant was asked to return to the police sta-
tion and a third lineup was held with counsel
present in which the witness identified defendant.

Judge JOHN H. GILLIS, after noting that the
dangers in photographic identification are at least
as great or greater than in corporeal, wrote for the
panel:

"[W]e hold that an accused being held in custody is
entitled to be represented by counsel at any photo-
graphic identification proceeding." 38 Mich App 763,
768.

The Court went on to apply the rule to the case
where defendant Cotton was *not* in custody be-
cause the investigation had focused on defendant:

"Turning to the photographic display in the present
case, we are of the opinion that this was no longer an
in-the-field identification. Its purpose was to build a case

---

[15] *People v Pinnette,* 42 Mich App 250 (1972), would limit the right
to counsel in photographic identification procedures to the time
beginning with the issuance of the warrant. See 42 Mich App 250,
255, fn 3. *Pinnette* is now pending disposition in this Court.

against the defendant by eliciting identification evidence, not to extinguish a case against an innocent bystander." *Id,* 769–770.

*Cotton* and the other cases holding there is a right to counsel in photographic identification recognize that *Wade* was founded on well recognized principles of social science. The concurring opinion of Judge LEVIN in *People v Rowell,* 14 Mich App 190, 197 (1968), is the basis for the later Michigan cases on this issue such as *Cotton, supra.* In *Rowell,* Judge LEVIN considers the problem as follows:

"*The photographic identification stage is as critical as the lineup stage, perhaps more so. The danger of misidentification at the photographic identification stage is as great, perhaps greater.* Just as the facts and circumstances of a lineup identification cannot be readily reconstructed at trial * * * , so too the facts and circumstances of a photographic identification preceding the lineup cannot later be readily reconstructed.

"I am persuaded, and this is the reason I write to state my separate views, that *on principle photographic identification should be prohibited where the defendant is in custody* unless the witness is physically incapacitated from going to a place where a lineup can be conducted. * * * And in that rare situation where photographs may properly be displayed of an accused person already in custody, *the accused person in entitled to be represented by counsel at the photographic identification stage for the reasons expressed in* Wade *and* Gilbert." 14 Mich App 190, 198–199. (Footnotes omitted, emphasis added.)

As the citation in *Rowell, supra,* indicates, the authorities which persuaded Judge LEVIN are Wall, *Eye-Witness Identification in Criminal Cases* (1965) and the extensive references quoted and cited therein. In all, 8 of the 13 Court of Appeals

Judges[16] plus 2 visiting Judges[17] have had occasion to consider this matter. All of them now appear to agree on the principle that an accused in custody is entitled to counsel at a photographic identification procedure.

There is strong support for this Michigan position in the Federal Courts, in other State Jurisdictions and in England. The United States Supreme Court has not directly ruled on the subject yet, but Justice Harlan in *Simmons,* where the right to counsel was not raised, spoke of the greater dangers of photographic identification as follows:

"The reliability of the identification procedure could have been increased by allowing only one or two of the five eyewitnesses to view the pictures of Simmons. If thus identified, Simmons could later have been displayed to the other eyewitnesses in a lineup, thus permitting the photographic identification to be supplemented by a *corporeal identification, which is normally more accurate.* See P. Wall, Eye-Witness Identification in Criminal Cases 83 (1965); Williams, Identification Parades [1955] Crim. L. Rev. 525, 531." *Simmons,* 386, n 6. (Emphasis added.)

The references to Wall by Justice Harlan in *Simmons* conclude in part as follows:

"*[A] photographic identification, even when properly obtained is clearly inferior to a properly obtained corporeal identification.* Consequently, witnesses should be asked to examine photographs *only when a proper corporeal identification is impossible* (as where no suspect has yet been found) or *difficult.* In any other case, the use of photographs is *improper,* for it constitutes

[16] Judges V. J. BRENNAN; BRONSON; T. M. BURNS; DANHOF; J. H. GILLIS; FITZGERALD; LEVIN; QUINN. See cases cited in text, *ante,* pp 180, 181. With respect to Judges DANHOF and BRONSON compare *People v Wilkins,* 36 Mich App 143 (1971) with *People v John Martin,* 37 Mich App 621, 628 (1972).

[17] Judges VAN VALKENBURG and TARGONSKI.

the unnecessary employment of an identification proce-dure clearly inferior in reliability to one which is available." Wall, 70. (Emphasis added.)

In *United States v Ash,* 149 US App DC 1; 461 F2d 92 (1972), *cert granted,* 409 US 909; 92 S Ct 2436; 32 L Ed 2d 682 (1972) Judge Leventhal wrote for the Court:

"[T]he dangers of mistaken identification from un-counseled lineup identifications set forth in *Wade* are applicable in large measure to photographic as well as corporeal identifications. * * * While these difficulties may be somewhat mitigated by preserving the photo-graph shown, it may also be said that a photograph can preserve the record of a lineup; yet this does not justify a lineup without counsel." *Id,* 9–10.

See also *United States v Zeiler,* 427 F2d 1305, 1307 (CA 3, 1970).[18] But cf. *McGee v United States,* 402 F2d 434 (CA 10, 1968), *cert den,* 394 US 908; 89 S Ct 1020; 22 L Ed 2d 220 (1969); *United States v Bennett,* 409 F2d 888 (CA 2, 1969), *cert den sub nom United States v Haywood,* 396 US 852; 90 S Ct 113; 24 L Ed 2d 101; *reh den,* 396 US 949; 90 S Ct 376; 24 L Ed 2d 256 (1970).[19]

---

[18] We discuss *Zeiler* as a "case" for its reasoning while recognizing that the third circuit, sitting *en banc,* does not approve of *Zeiler.* See *United States, ex rel Reed v Anderson,* 461 F2d 739 (CA 3, 1972).

[19] We acknowledge with Judge Leventhal that "a majority of the courts that have ruled on the question have held *Wade* inapplicable to photographic viewings and identification." *United States v Ash,* 149 US App DC 1, 8; 461 F2d 92, 99 (1972). See cases cited in fn 8 of *Ash* (461 F2d 92, 99) and see footnotes 16–29 of Judge Wilkey's dissent (461 F2d 92, 110–112). See also the comments and cases collected in Sobel, *Eye-Witness Identification,* §§ 45–51, § 83.03 (1972). The reason-ing of the two lines of cases holding there is no right to counsel in photographic lineups, in our view, misconstrues the thrust of the *Wade-Gilbert-Stovall-Simmons* principles in some respects and in others the premises of the reasoning can be seriously questioned. The most telling observation that can be made of these cases is that they do not address the rationale of *Wade* and *Simmons—that the psycho-logical factors underlying the danger in corporeal identification would apply in equal or greater measure to identification by photograph.*

The Pennsylvania Supreme Court said in *Commonwealth v Whiting,* 439 Pa 205, 209; 266 A2d 738, 740; *cert den,* 400 US 919; 91 S Ct 173; 27 L Ed 2d 159 (1970):

"Wade *cannot be undercut simply by substituting pictures for people, nor can the police prepare a witness for the lineup by privately showing the witness pictures of the accused.*"(Emphasis added.)

In *Thompson v State,* 85 Nev 134, 137; 451 P2d 704, 706; *cert den,* 396 US 893; 90 S Ct 189; 24 L Ed 2d 170 (1969) the Supreme Court of Nevada said:

"*We can discern no substantial difference between a lineup of photographs of persons and a lineup of the persons themselves* insofar as the constitutional safeguards required by Wade, supra, are concerned." (Emphasis added.)[20]

Justice Traynor of the California Supreme Court said in *People v Gould,* 54 Cal 2d 621, 631; 354 P2d 865, 870; 7 Cal Rptr 273, 278 (1960):

"Identification from a still photograph is *substantially less reliable* than identification of an individual seen in person." (Emphasis added.)

In England, whose courts are known for their "no nonsense" approach to criminal evidence, prelineup display of photographs has long been grounds for quashing the conviction. See *Rex v Haslom,* 19 Crim App R 59, 60; 134 L T R 158 (1925), where police showing of photographs to witnesses after the accused had been arrested was "indefensible" and the conviction was quashed. See

---

[20] The force of the case is not affected by the post-*Kirby* decision of *Baker v State,* — Nev —; 498 P2d 1310 (1972).

also *Rex v Goss,* 17 Crim App R 196, 197 (1923) where the Court said:

"No doubt there are circumstances in which the police of necessity make use of photographs, but to make use of photographs beforehand to see whether important witnesses can identify an accused person whom they are afterwards going to see is to pursue a course which is not a proper one."[21]

From our own examination of the authorities as cited in this opinion and discussed briefly in Appendix A, we conclude that eyewitness identification through photographs is at least as hazardous as corporeal identification and probably is more hazardous to the securing of correct identifications.

We therefore derive the following two rules:

1. *Subject to certain exceptions,*[22] *identification by*

[21] See also *United States v Clark,* 289 F Supp 610, 621 (ED Pa 1968); Fogelson, *Control of Procedures for Identifying a Suspect,* 12 J For Sci 135, 144 (1967) ("if a suspect is in custody, only corporeal identification ought to be used."); Rolph, *Personal Identity* 33 (1957) ("These two forms of proof [corporeal and photographic] are not mutually destructive as evidence, but the first greatly weakens the second and experienced police officers are loth, as a rule, to have them in combination."); Williams, *Identification Parades,* 1955 Crim L Rev 525, 529 (1955) ("there is no difference between showing the suspect to the witness and showing a photograph to the witness."); Comment, *Prior Identification and the Hearsay Objection,* 30 Rocky Mt L Rev 332, 341 (1958) (Use of photographs after arrest characterized as "grossly improper."); Wigmore, *The Science of Judicial Proof,* §.252, p 538 (1937); Burtt, *Legal Psychology* 97 (1931) ("This same principle [governing corporeal lineups] would apply to recognizing photographs or other similar material."); To the same effect: Gross, *Criminal Investigation* (5th ed, Jackson 1952), p 159; Grophe, *Showing Prisoners to Witnesses for Identification,* 1 Am J Police Sci 79 (1930); *Notes, Pretrial Photographic Identification—A "Critical Stage" of Criminal Proceedings?,* 21 Syracuse L Rev 1235, 1242 (1970); Comment, *Photographic Identification,* 56 Iowa L Rev 408, 419 (1970); Sobel, *Assailing the Impermissible Suggestion: Evolving Limitations on the Abuse of Pre-Trial Criminal Methods,* 38 Brooklyn L Rev 261, 264, 296 (1971).

[22] See Wall, pp 42, 72–73. Some of the situations which may, in a particular case, possibly justify the *use* of photographs are:

1. It is not possible to arrange a proper lineup.

*photograph should not be used where the accused is in custody.*

2. *Where there is a legitimate reason to use photographs for identification of an in-custody accused, he has the right to counsel as much as he would for corporeal identification procedures.*[23]

## V. APPLICATION OF RULES TO THE FACTS OF THIS CASE

Although defendant Anderson was in custody before the first photo identification took place at about 11:15 p.m., the failure to have counsel present falls within a well-recognized exception—there was *necessity* for an immediate identification since the victim was critically ill in the hospital's intensive care unit and because of the hour and other facts it was not possible to arrange an immediate lineup. See *People v Adams,* 19 Mich App 131, 133 (1969); *People v Rowell,* 14 Mich App 190, 198–199

---

2. There are insufficient number of persons available with defendant's physical characteristics.

3. The nature of the case requires *immediate* identification.

4. The witnesses are at a place far distant from the location of the in-custody accused.

5. The subject refuses to participate in a lineup and by his actions would seek to destroy the value of the identification.

We express no opinion on the situation where photographs are taken of a corporeal lineup that was fair in all respects and where the accused was represented by counsel and these photographs are later shown to witnesses who had not observed the lineup. See *United States v Brown,* 149 US App DC 43, 54 ff; 461 F2d 134, 145 ff (1972); *United States v Collins,* 416 F2d 696 (CA 4, 1969).

[23] Among the recognized *justifications* for absence of counsel at eyewitness identification procedures are: (1) "intelligent" waiver of counsel by the accused, see *e.g., People v Shipp,* 21 Mich App 415 (1970); (2) emergency situations requiring immediate identification, see *e.g., People v Adams,* 19 Mich App 131, 133 (1969); (3) prompt, "on-the-scene" *corporeal* identifications within minutes of the crime, see *e.g., Russell v United States,* 133 US App DC 77; 408 F2d 1280 (1969).

(1968). Under these circumstances, even a one-man corporeal confrontation such as used in *Stovall* might be justified, but the better course would be to *first* conduct a photographic "lineup" with a *fair* display of pictures.

A different conclusion follows respecting the second and third identifications. The second identification was conducted by the prosecutor on the day following the first identification. Although the use of photographs rather than a corporeal lineup may have been justified under the circumstances, there is no claim that the victim was in so serious a condition that there was still a need for swift action. There was plenty of time to arrange either for defendant's counsel or substitute counsel to be present or to secure an "intelligent" waiver.

The third identification took place three days before the preliminary examination without the knowledge or consent of the prosecutor and without notice to counsel who had been assigned weeks earlier. On oral argument, the people concede that the use of this procedure was inexcusable. In view of the fact that the victim was well enough to testify for hours at the preliminary examination three days later, there is no excuse for not at least attempting to arrange a corporeal lineup rather than using photographs. There is also no excuse for failing to notify counsel.

Our holding that defendant was denied his right to counsel with respect to the second and third photo identifications establishes the legal reason in this case why the people are required to show an independent basis for the in-court identification by clear and convincing evidence.

While we agree that there is an independent basis for the in-court identification in this case, it is necessary because of the highly suggestive iden-

tification procedures employed, to establish more evidence than the two factors mentioned by the trial court and the Court of Appeals.[24] In cases where the identification procedures employed are suggestive and conducive to irreparable misidentification then, by definition, these procedures operate upon the unconscious recognition process of the witness and create a likelihood that there will be a misidentification irrespective of the degree of previous acquaintanceship between the witness and the culprit and irrespective of the opportunity to observe during the commission of the crime.

Where the procedures used are, as in this case, grossly beyond the bounds of propriety it becomes even more important to examine the evidence of what "independent" knowledge the victim or witness had of the identity of the culprit *before* suggestive influences were brought to bear.

Importantly, while in the emergency room at the hospital the victim was questioned by Officer Gransden and her responses were by nodding her head "yes" or "no". When asked who did this to her she was able, despite her condition, to scrawl on the back of a surgical glove envelope the following:

"He comes in where I work. Aladdin Bar Bay City."

The victim was also questioned in the X-ray room before surgery by the ambulance driver in the presence of a nurse. He asked whether he was white and she shook her head "no"; colored?—

---

[24] The trial court held that the in-court identification had an independent basis because the complainant had seen the defendant on prior occasions in the bar where she worked and that she recognized him at the time of the alleged assault. The Court of Appeals (29 Mich App 578, 581 [1971]) affirmed this determination noting the same two factors as the trial court—the victim had seen the defendant previously on four or five occasions in the bar and was able to observe the man's face during the assault.

"no"; Mexican?—"no"; Indian?—here she re-
sponded by gutteral voice sounds and had to say
the word several times before the ambulance
driver and the nurse present were both to under-
stand.

"It was a positive, she said Indian and she was very
affirmative about the negatives, if you understand what
I mean. She shook her head as best she could when I
asked the question."

Although there was testimony that an Indian
other than the appellant was in an altercation
with the victim and her male escort in a down-
town Bay City bar a week or two before the crime
and the same Indian was seen leaving the bar
where the victim worked about a week before the
crime occurred, there was no suggestion that this
other Indian was either a regular patron of the
Aladdin Bar or that he and the victim had ever
been in the Aladdin Bar at the same time.

Because of this evidence of the victim's knowl-
edge before the suggestion took place viewed in
combination with her previous acquaintance with
defendant, we are satisfied that her in-court identi-
fication was accurate in spite of the employment of
grossly suggestive procedures calculated (albeit
unintentionally) to prompt an identification of
whatever Indian was pictured. It just happens in
this case that the Indian pictured was the right
Indian, as the jury found beyond a reasonable
doubt. Because we find there was an independent
basis established by clear and convincing evidence,
there is no occasion for us to determine whether
the victim's identification testimony was "harm-
less" constitutional error.[25]

## VI. MINOR ISSUES

A. *Was it Prejudicial Error for the Defendant to*

---

[25] We express no opinion as to whether the corroborative evidence
in this case could, if necessary, enable a court to say beyond a

*be Handcuffed and Subjected to Security Precautions?*

We recognize that a defendant may be prejudiced in the eyes of the jury by being shackled and manacled in their presence. *People v Duplissey,* 380 Mich 100 (1968). However, we agree with the Court of Appeals that there was no prejudicial error in this case and we adopt that portion of their opinion, 29 Mich App 578, 582 (¶2)–583(¶1).

B. *Was it Prejudicial Error to Admit Photographic Slides Depicting the Condition of the Victim While Being Treated at the Hospital?*

This issue is controlled by our recent decision in *People v Eddington,* 387 Mich 551, 561–563 (1972). Under the standards of *Eddington* we find no reversible error or abuse of discretion in the use of the photographs here.

## CONCLUSION

This case graphically demonstrates the need for police and prosecutorial agencies to cooperate in promulgation and enforcement of legally sufficient and practically effective written guidelines for identification procedures, both corporeal and photographic.

The conviction is affirmed.

T. M. KAVANAGH, C. J., and T. E. BRENNAN and T. G. KAVANAGH, JJ., concurred with WILLIAMS, J.

SWAINSON, J., concurred in the result.

---

reasonable doubt that the identification testimony did not affect the verdict. The evidence consisted of: matching paint smears from defendant's and victim's car; a fingerprint of less than perfect character; blood on defendant's car seat of the same type as the victim's; testimony that a car like defendant's was in the area of the victim's house in the early morning hours, and that such a car followed the victim when she left her house.

## APPENDIX A

## OUTLINE

I. ADDITIONAL REFERENCES TO THE LEGAL & SCIENTIFIC RECOGNITION OF THE EXISTENCE AND SCOPE OF THE PROBLEM. ..................... 193

Three Cases discovered in Michigan:
   1. Louis Nasir ..................... 197
   2. Charles Edward Richardson ....... 199
   3. Charles Clark ................... 200

II. WHAT ARE THE CAUSES OF THE PROBLEM? ........................... 202
  A. *"RECOGNITION"* ................. 203
   1. Identification is the result of Recognition Memory which is inherently less accurate than "recall".. 204
   2. "Recognition" encourages "positive" identification of things which are merely "similar". ............... 205
  B. *PERCEPTION, MEMORY & "INTERFERENCE"* ..................... 210
   1. unexpected events ............... 211
   2. "critical" situations, emotion, retrograde amnesia ................. 211
   3. "filling in" process—expectations .. 212
   4. other factors—drugs, fatigue, status, etc. ........................... 213
   5. The role of time ................. 214
  C. *SUGGESTION* ..................... 215
  D. *COGNITIVE DISSONANCE.* ........ 217

*CONCLUSIONS* .......................... 220

## APPENDIX A

## THE PROBLEM OF EYEWITNESS IDENTIFICATION

The text of the opinion (pp 160–191) makes refer-

ence to some of the abundant scientific and legal authorities concerning the existence and scope of the problem. This Appendix A supplements the opinion with additional references to the legal and scientific recognition of the problem (Part I) and presents a survey of some psychological factors identified as major causes of the problem (Part II).

## I. LEGAL & SCIENTIFIC RECOGNITION OF THE EXISTENCE AND SCOPE OF THE PROBLEM

"[T]he assumption [is] that witnesses can see accurately, hear accurately, and recall accurately. This assumption which is the keystone 'As If' of the law of evidence, is in fact contradicted by the findings of psychological science."[1]

Scores of legal and scientific writers have commented on the make-believe quality of some of our rules of evidence:

"The notion, still tolerably prevalent, that the faithfully sworn testimony of a mentally competent witness is in general to be regarded as an exact presentation of reality is without justification."[2]

For some reason, the law has until recent years in such decisions as *Wade* and *Simmons*, ignored

[1] Marshall, *Law and Psychology in Conflict*, (1966), pp 10–11.

[2] Blom-Cooper & Wegner, *Psychological Selectivity in the Courtroom*, 8 Med Sci & Law 31, 34 (1968) quoting Stern, *Abstracts of Lectures on the Psychology of Testimony*, 21 Am J Psychology 270–282 (1910); see also *e.g.*, Bartlett, *Remembering* (1932), p 51 ("We must get rid of the notion that memory is primarily or literally reduplicative, or reproductive."); to the same effect: Hunter, *Memory* (1957), pp 13–38; Munsterberg, *General and Applied Psychology* (1923), pp 395–413; Berrien, *Practical Psychology*, (rev ed 1952), ch 15; Wigmore, *The Science of Judicial Proof*, (1937), §§ 171, 191, p 388; Munsterberg, *On The Witness Stand: Essays on Psychology and Crime* (1923), pp 18–20.

what the behavioral sciences can tell us about the reliability of eyewitness testimony. Almost 90 years ago, Hugo Munsterberg, a pioneer in experimental and theoretical psychology, wrote:

"The courts will have to learn, sooner or later, that the individual differences of men can be tested to-day by the methods of experimental psychology far beyond anything which common sense and social experience suggest. Modern law welcomes, for instance, for identification of criminals all the discoveries of anatomists and physiologists as to the individual differences; even the different play of lines in the thumb is carefully registered in wax. But no one asks for the striking differences as to those mental details which the psychological experiments on memory and attention, on feeling and imagination, on perception and discrimination, on judgment and suggestion, on emotion and volition, have brought out in the last decade."[3]

---

[3] Munsterberg, *On the Witness Stand: Essays in Psychology and Crime* (1923), p 63. Hugo Munsterberg and Hans Gross were German pioneers in the field of psychology. Munsterberg began his experiments in the late 1800's and migrated to the United States where he became a renowned professor at Harvard. Although there are numerous areas on the frontiers of psychology and physiology that should be viewed with caution, we must recognize that science has established a great deal that is highly relevant to evaluating eyewitness testimony:

*"It is easy to get the impression that in Psychology there is little that is firmly established,* and that the subject consists in the main of a tissue of highly speculative theories, all extremely controversial and affording no firm basis for confident application. *Though the impression is understandable it is quite seriously mistaken."* (Emphasis added.) MACE, Editorial foreword to Hunter, *Memory* (1957).

To the same effect, but less charitable to the law in its reluctance to recognize these principles is Anastasi, *Fields of Applied Psychology* (1964), pp 547–548:

"The effect of this policy, however, is that *the psychological principles actually followed in legal practice are sometimes so manifestly obsolete as to be almost unanimously rejected by psychologists * * ** much of what psychology can contribute * * * is derived from established facts of sensation, perception, memory, and other familiar areas of experimental psychology." (Emphasis added.)

This point has been made over and again. See, *e.g.,* Marshall, *Law & Psychology in Conflict* pp viii–ix (1966), (foreword by Loevinger); Burtt, *Legal Psychology* (1931), p 5; Touster, *Law & Psychology: How the Twain Might Meet,* 5 American Behavioral Scientist (1962), pp 3–4; Kubie, *Implications for Legal Procedure of the Fallibility of Human*

And even since *Wade* and *Simmons,* many decisions seem to have misconstrued the thrust of the Supreme Court's concern. See *e.g.,* Notes, *Pretrial Identification Procedures—Wade to Gilbert to Stovall: Lower Courts Bobble the Ball,* 55 Minn L Rev 779 (1971). We have therefore made our own examination of the authorities cited in *Wade.* In order to properly make an independent evaluation we have also examined additional authorities, including many of the citations and references documenting the authorities cited in *Wade.* Aside from the recognition of the impact of science and psychology on evidence generally, there is specific recognition of the problems in the area of eyewitness identification. For example, Dean Wigmore, in *The Science of Judicial Proof* (1937), §§ 253, 254 catalogues numerous cases of erroneous identification. He says of the process of securing eyewitness identification:

"The whole process therefore calls for caution and precaution.

"1. *It calls for caution, in that testimonial assertions to identity must be accepted only after the most careful consideration.* On the one hand, the process of Recognition being often more or less subconscious, it *may* be quite correct, even though no specification of marks can be given as reasons for recognition. On the other hand, *the risk of injustice being so serious, the great possibilities of lurking error should cause hesitation.* * * *

"2. The process also calls for *precaution,* in taking

*Memory,* 108 U Pa L Rev 59 (1959); Gardner, *The Perception and Memory of Witnesses,* 18 Cornell L Q 391 (1933); Degreer, *Anything But the Truth? The Reliability of Testimony in Criminal Trials,* 11 British J Crim 131 (1971); Gross, *Criminal Psychology* (1911), §§ 98–103; *The Case Against Personal Identification,* 13 Ft Knightly LJ 87 (1943); McCarty, *Psychology & the Law* (1960), pp 177–222; Britt, *The Lawyer and the Psychologist,* 36 Ill L Rev 621 (1942); Wigmore, *Professor Munsterberg and the Psychology of Testimony,* 3 Ill L Rev 399, 433 (1909); Rosenblum, *A Place for Social Science Along the Judiciary's Constitutional Law Frontier,* 66 Nw U L Rev 455 (1971).

measures beforehand objectively to reduce the chances of testimonial error * * * ." *Id,* § 252, p 537. (Emphasis added except the words *"caution"* and *"precaution.")*[4]

The opinion, p 179, makes reference to a number of authors documenting examples of misidentification. Often quoted in cases and other materials on the problem are the comments of Felix Frankfurter:

"What is the worth of identification testimony even when uncontradicted? The identification of strangers is proverbially untrustworthy. The hazards of such testimony are established by a formidable number of instances in the records of English and American trials. These instances are recent—not due to the brutalities of ancient criminal procedure." Frankfurter, *The Case of Sacco & Vanzetti* (1927), p 30.[5]

---

[4] See also, *e.g.,* the Pennsylvania case of *Estate of Bryant,* 176 Pa 309, 318; 35 A 571, 577 (1896), noted in Wall, *Eye-Witness Identification in Criminal Cases* (1965, 1971 2d printing), p 6:

"There are few more difficult subjects with which the administration of justice has to deal. The carelessness or superficiality of observers, the rarity of powers of graphic description, and the different force with which peculiarities of form or color or expression strike different persons, make recognition or identification one of the least reliable of facts testified to even by actual witnesses who have seen the parties in question * * * ."
In 1909, the same Court remarked:

"No class of testimony is more uncertain and less to be relied upon than that as to identity." *Commonwealth v House,* 223 PA 487, 493; 72 A 804, 806 (1909).
Harris, *A Treatise on the Law of Identification* (Albany—H.B. Parsons, 1892) was one of the earliest treatises on the law of evidence. The author explains that identification of persons is the most important identification problem partly because of the "great number of important cases of mistaken identity, both in civil and criminal practice". *Id,* § 1.
The author has this to say about the identification of people by their personal appearance:

"This branch of the subject, simple as it may seem * * * [to] those unaccustomed to reasoning on the subject, is, on the contrary, perhaps one of the most difficult questions with which courts and juries are called upon to deal. * * * But where is the remedy? It lies alone in caution and prudence. Observation and sad experience admonish courts and juries to use of the utmost care, caution and prudence." *Id,* § 3, pp 2–3.

[5] Wilder & Wentworth, *Personal Identification* (1918) point out that

The actual number of these tragic miscarriages of justice may never be known. Although no systematic study has ever been conducted in Michigan, we were able in a few hours inquiry to turn up three recent examples of misidentification in Wayne and Macomb Counties.

## 1. Louis Nasir

The case of Louis Nasir illustrates one of the reasons that cases of erroneous conviction are difficult to ferret out—the evidence offered and the testimony of eyewitnesses is no different, but to the contrary, the case is indistinguishable from cases of correct identification. The innocence of the convicted man comes to light not from the record or proof itself but, as in the Nasir case, by the confession of a criminal who is later arrested for an unrelated crime. In fact in the Nasir case, this might not even have happened except for the diligent post-trial investigation by the Warren Police Department, the Macomb Prosecutor's Office and court-appointed counsel.

Louis Nasir was once arrested for commission of a crime as the result of mistaken identification.

the occasional unusual case is not the problem but that:

"[C]ases of mistaken identity are alarmingly frequent, and that criminal history is full of cases in which * * * perfectly innocent men have been compelled to serve long terms of imprisonment * * * ." *Id,* 37.

The somewhat bold conclusion of these authors is that "[t]he outcome of this inquiry is plainly and irrefutably this: *Sight Recognition is not Identification". Id,* 40. (Emphasis in original.) See also, *United States v Wade, supra,* pp 232–235; Block, *The Vindicators* (1963); Gardner, *The Court of Last Resort* (1952); Reynolds, *Courtroom* (1950); Mc-Carty, *Psychology & the Law* (1960), pp 177–222; Wall, *Eye-Witness Identification in Criminal Cases* (1965), pp 5–25; *The Case Against Personal Identification,* 13 Ft Knightly L J 87 (1943); Comment, *Possible Procedural Safeguards Against Mistaken Identification by Eyewitnesses,* 2 UCLA L Rev 552 (1955); *Safeguards Against Erroneous Identification,* State of New York, 14th Annual Report of the Judicial Council 229 (1948).

Although no charges were brought his picture was taken and found its way into the "mug book". Several years later in May of 1965, a bandit wearing wraparound sunglasses and a straw hat held up a credit union in Warren and escaped with almost $5,000. There were three witnesses, the manager, an employee named Dimples Anderson and a credit union customer. On the afternoon of the robbery the manager and Dimples were unable to select anyone from a mug book and were unable to select anyone from a lineup in which Louis Nasir was not present. The day after the robbery the manager and the employee picked Nasir from a mug book and also picked him in a one-man "showup" from behind a one-way glass. On the following Monday all three witnesses picked Nasir from a lineup that did not appear unfair in itself from the record, absent any prior suggestion in the one-man photo showup or any suggestion that may have occurred in the use of photographs.

Nasir was tried for robbery and the sole issue was identification. Despite the testimony of six witnesses who said they saw Nasir at work the day of the robbery, the jury believed the identification testimony of the credit union manager, Dimples Anderson and the customer and returned a verdict of guilty. Nasir was sentenced to serve 7 to 20 years in prison.

The court-appointed attorney who was to prosecute the appeal was convinced of Nasir's innocence and enlisted the aid of the two detectives who helped convict Nasir. Working together, the three men found the man who confessed to being an accomplice to the crime. The real robber, who resembled Nasir, had been shot to death in February, 1966. A friend of the dead man, who was serving time in Jackson, corroborated the story by

revealing that the crime had been admitted to him before the death of the real culprit.[6]

An hour after Nasir took lie detector tests he was freed on bond pending a new trial and the charges were dismissed on motion of the prosecutor. Nasir had spent 375 days in prison.

One of the ironies of the case is the absolute certainty of the witnesses regarding their identification of Nasir. Dimples Anderson, for example, testified that she had no doubt whatsoever about the identity of the man:

"*Q.* It's possible that you could have made a mistake today?

"*A.* No.

"*Q.* If you should find out later—if I were to tell you — * * * that this man could not have possibly been there, would you say that you could be mistaken?"[7]

## 2. *Charles Edward Richardson*

On January 16, 1968, a man held up a gas station and escaped. The two gas station attend-

---

[6] The credit union customer turned out to be involved in the robbery and admitted his perjured testimony. However, this witness had no impact or *contact* with the other two witnesses who made their "positive" and unshakable identifications *three times* before the customer was even available to view a lineup.

[7] At this point objection was made by the prosecutor to the question and the witness was never allowed to answer although the record is clear that her answer would be no. No doubt, in retrospect the witness must feel badly shaken by the certitude of her feeling that her identification was correct. Looking back on the case and knowing that this was a case of the wrong man convicted, other comments by the trial judge seem peculiarly ironic where, for example, he mentioned to the jury:

"There is often the misfortune of being arrested that has nothing to do with the type of person."

The report is a composite of a story in the Detroit News, March 17, 1967, section A, page 1: *"Innocent man's 375 long days in prison ended";* and three volumes of official transcript in the case of *People of the State of Michigan v Louis Abraham Nasir,* Macomb County Circuit Court No. C-65-538. The transcript was graciously loaned to the Court by the firm of Towner, Rosin & York of Mt. Clemens.

ants positively identified Charles Richardson, who lived in the neighborhood and was about the same size as the man who robbed the station. Two or three months later a man named Kendrick was arrested on an unrelated charge and as the result of diligent police investigation he confessed to the robbery of the gas station. Charles Richardson was released from Jackson Prison. After this evidence was presented to the trial judge, Honorable Horace W. Gilmore, the charges were dismissed on motion of the prosecutor.

This is another case where there was no intentional suggestion and the witnesses were honestly "positive" in their minds about the earlier identification. Again the error is not apparent from the record but was only discovered by diligent police investigation of an unrelated crime. At the nolle prosequi hearing the identifying witness upon seeing both the innocent man and the confessed robber could no longer make an identification:

> "*The Court:* You are aware that Mr. Kendricks has admitted to committing this crime?
> "*A.* Yes, I heard.
> "*The Court:* And has testified that Mr. Richardson did not do it?
> "*A.* Yes, I do, sir.
> "*The Court:* Can you identify either one of them as the person?
> "*A.* Well, right now, positively, I couldn't."[8]

## 3. *Charles Clark*

On November 23, 1937, three men held up a clothing store in Hamtramck. The owner was shot

---

[8] Data from conversation with detectives of Ecorse Police Department; Hon. Horace W. Gilmore; and official Transcript of *People v Charles Edward Richardson,* Circuit Court for County of Wayne (3), Criminal Case No. 45947. The quotation is from the nolle prosequi hearing, pp 17–18.

and killed. The owner's daughter, who was 21
years old at the time, went to the assistance of her
father and was slugged with a revolver by one of
the robbers. Charles Clark was later identified by
the girl in a lineup as the man who shot her
father. One of the other defendants implicated
Clark in an initial statement, but he and two
others said at the trial later that Clark had no
part in it. Clark's landlady testified that he was
home all that day. Nevertheless, Clark was con-
victed primarily on the identification testimony of
the young woman and was sentenced to life im-
prisonment.

Clark tried for a new trial several times over the
30-years imprisonment, but it was denied each
time. Partly because Clark was an exemplary
prisoner he was offered parole by the prison au-
thorities and later was offered a pardon and com-
mutation of sentence, but he turned these down
because acceptance of such terms would have been
a tacit admission of guilt. At one point in a quest
for a new trial he was offered the opportunity to
plead to a lesser charge, the sentence of which
would have freed him immediately. Again he re-
fused.

Finally in 1968 the case was assigned to the
Legal Aid & Defenders Association of Detroit. The
attorneys researched early transcripts and discov-
ered that the victim's daughter, the sole identify-
ing witness, had originally said that she could not
identify Clark as one of the bandits. In an affidavit
in support of the motion for a new trial the
witness revealed that after she said she could not
identify the defendant, the Hamtramck detectives
had pointed Clark out as the guilty man before the
lineup.

Clark was granted a new trial in 1968 and the

case was dismissed on motion of the prosecutor. As a result of this, on January 28, 1972, Public Act No. 1 of the 76th Legislature was signed into law by Governor William G. Milliken as follows:

"Sec. 1. There is appropriated from the general fund of the state the sum of $10,000.00, to Charles Lee Clark, born October 17, 1899 at Americus, Georgia, residing at 238 E. Mount Vernon, Detroit, Michigan, for mental suffering incurred in state prison for an offense of which he was found innocent upon later trial after 30 years of confinement.

"Sec. 2. The money appropriated under the provisions of this act is not made in payment of any claims for damages, but is provided solely out of humanitarian consideration.

"Ordered to take immediate effect.

"Approved January 28, 1972."[9]


## II. WHAT ARE THE CAUSES OF THE PROBLEM?


*Wade* and *Simmons* recognize the psychological factors entailed in identification.[10] Briefly, the causes stem from the universal fallibilities of perception and memory. Even assuming favorable conditions attending both the original perception and the memory period, there is additional possi-

[9] There are no official reports printed in the case of Charles Clark. To avoid the expense of transcript, reliance has been placed on the reports of the case in the Detroit News on various dates as follows:

May 10, 1938: *"4 Go on Trial as Holdup Killers."* May 15, 1938: *"Jury Convicts 4 in Holdup Slaying."* June 15, 1938: *"3 Holdup Slayers Draw Life Terms."* July 25, 1968: *"2 Lifers Get Retrial, May Win Release."* August 16, 1968, § D, p 18: Al Blanchard's Column, *"Give or Take 30 Years."* December 4, 1969, § D, p 22: Al Blanchard's Column, *"What Price Justice?"* May 4, 1970, § A, p 13: *"False Arrest Suit Halted; Court Kills a Dream."* July 30, 1971, § A, p 3: *"Innocent Man not Bitter."* August 28, 1971, § A, p 8: *"Senate Votes $10,000 for Ex-Prisoner."* January 29, 1972, § A, p 3: *"State Pays for 30 Years of a Man's Life."*

[10] *Wade,* 228–239; *Simmons,* 383–386.

bility for error inherent in the "recognition process" itself. The possibility for error from these sources will be increased by the operation of aggravating factors, a major one being the many subtle forms of suggestion.

The combined operation of these factors becomes even more significant in the process of seeking truth at trial because of another phenomenon singled out in *Wade* and *Simmons*—*once any identification decision is made it may well be "irreparable"*—the witness, whether right or wrong, is unlikely to change his or her mind.[11] So for judges, lawyers and even more so to police (who have the most difficult job of finding and building a case against the one right man out of many) the important question is whether an identification is irreparably *correct* or whether it is probably an irreparable *misidentification.* It is important therefore to understand something of the operation of some of the most basic of these principles of psychology because our only measure of the probative worth of identification evidence is an ability, however fragile, to weight the probability of error in a given set of conditions.

## A. *"RECOGNITION"*

Since "identification" entails an act of recognition, some knowledge of the literature on the psychology of recognition is helpful in appreciating the impact of suggestion and the effects of inaccurate memory or perception. Inherent in the process of recognition itself are two basic factors which encourage error. As will be seen, these factors are what the Court meant in *Wade* when it mentioned "identification parades" and "showups" and said:

---

[11] *Wade,* 229; *Simmons,* 383–384.

"It is obvious that risks of suggestion attend either form of confrontation and increase the dangers inhering in eyewitness identification."[12]

*Simmons* also referred to the suggestion inherent in the procedure itself:

"Even if the police subsequently follow the most correct photographic identification procedures * * * there is some danger that the witness may make an incorrect identification."[13]

1. *Identification is a Result of "Recognition" Memory and is Less Accurate than "Recall" Memory.*

"Recall" and "Recognition" are distinct forms of remembering. "Recall" is a straigtforward proposition in which there are only very limited "cues" available to aid memory and the range of possible responses eliminates any significance in guessing. "Recognition" memory, on the other hand, arises *only* where useful memory cues do exist and the job is to make a "right" choice, or "reasoned" guess between the presented alternatives.[14]

Identification of suspects is a form of "recognition memory" involving an element of choice. As the number of possible choices decreases, the possibility of guessing and the consequence of unreliable results increases. A one-man or one-photo "showup" is, like a "true and false" exam, simply a form of "recognition" memory where there are only two choices—yes or no—and a flip of the coin

---

[12] *Wade,* 229.

[13] *Simmons,* 383.

[14] Hunter, *Memory* (1957), pp 18–20; Hutchins & Slesinger, *Some Observations on the Law of Evidence—Memory,* 41 Harv L Rev 860, 864 (1928); *Safeguards Against Erroneous Identification,* State of New York, 14th Annual Report and Studies of the Judicial Council 229, 237 (1948); Burtt, *Legal Psychology* (1931), p 94.

would produce as many "right" answers as wrong
ones. In a true-false exam in school, however, we
can take comfort in our measure of accuracy be-
cause we have predetermined what choice is
"right". There is no such comfort in a showup.

Thus, in a display of six pictures, there is inher-
ent in the very process a degree of suggestion (the
mere display suggests one of them is "correct")
and a possibility of error (five out of six guesses).[15]

2. *"Recognition" Encourages Positive Identifica-
tion of Things Merely Similar.*

*Wade* and *Simmons* both note[16] that the very
process of sight recognition presents dangers that
persons who are merely similar may be perceived
as one and the same. *Wade* leads us to the expla-
nation found in Wigmore, *The Science of Judicial
Proof* (1937), §§ 250–253, and also noted in Wall,
*Eye-Witness Identification in Criminal Cases*
(1965), p 10. The gist of it is that Recognition
depends on "similarity" and therein lies the key to
false recognition and major opportunities for unin-
tentional, subtle suggestion.

When we "see" something "out there", the origi-
nal mental record consists of an "attitude" or
"sensation" composed of the various items in the

---

[15] Hunter, *Memory* (1957), pp 18–20; Wall, *Eye-Witness Identifica-
tion in Criminal Cases* (1965), p 82 (hereinafter usually referred to as
Wall). This difference has also been demonstrated with respect to
methods of direct and cross-examination of witnesses at trial. A free
narrative is less complete, but more accurate than careful step-by-step
development of the case or "answer yes or no, did etc. * * * ."
Marshall, *Law & Psychology in Conflict* (1966), p 109; Hunter, *supra,*
p 98; Marston, *Studies in Testimony,* 15 J Crim L & Criminology 5, 9–
11 (1924); Marshall, Marquis & Oskamp, *Effects of Kind of Question
and Atmosphere of Interrogation on Accuracy and Completeness of
Testimony,* 84 Harv L Rev 1620 (1971); Marshall, *The Evidence: Do
we see and hear what Is? Or do our senses lie?* 2 Psychology Today
(#9) 48, 51 (Feb, 1969).

[16] *Wade,* 229; *Simmons,* 383.

object perceived. This "attitude" or "sensation" is preserved in the memory (more or less imperfectly) in the combination of the various perceived items by a process sometimes called "association". What occurs during the recognition process is that a subconscious attitude or sensation of sameness or resemblance is aroused. This "attitude" or "sensation" of sameness is accompanied by a subjective feeling of "familiarity" when there are elements of similarity between the new and the previous situation.[17]

The way the mental processes operate in a hypothetical case (as lawyers are so fond of) is explained by Wigmore, *supra,* § 251. Dean Wigmore posits a simple case. There are two people, A and B. Each has perceivable characteristics (whatever they are) by which people identify him.

> PERSON A has perceivable characteristics which fall into patterns .................. [b c d e f g]
> PERSON B has perceivable characteristics which fall into patterns .................. [b c d m n p]

You, the reader, have seen *only* person A previously and are now confronted with *either* A or B (you don't know which). THE QUESTION IS: What are your chances of mistaking PERSON B for A? Now this is completely apart from any "suggestion" intentional or otherwise but considers only the relationship between perception and memory as they operate in the "recognition" process.

---

[17] The technical psychological terms vary but there is agreement on the subjective nature of the process. See Wigmore, *The Science of Judicial Proof* (1937), §§ 250, 251; Wall, p 10; Burtt, *Legal Psychology* (1931), p 94; Feingold, *The Influence of Environment on Identification of Persons and Things,* 5 J Crim L & Criminology 39, 42 (1914); *Safeguards Against Erroneous Identification, supra,* note 14, 237–238.

Four stages in the mental process which will produce the recognition are suggested by Wigmore:

"(1) First, the mind, when perceiving A, *perceived* a pattern, made up of items (say) b c d e f g.

"(2) Next the observer's memory *recorded* an impression of this pattern, all or part, *i.e.* all or some of the items b c d e f g associated.

"(3) Next, on being shown A or B, the mind *perceives* all or some of these items in the person perceived; if that person is A, the items perceivable will be b c d e f g; but if that person is B, the items perceivable will be (say) b c d m n p.

"(4) Next, comes the *recollection* of the originally recorded impressions by the stimulated process of association; and here the result depends on what took place mentally in stage (2) above:" Wigmore, *supra,* § 251, p 535.

\* \* \*

*"Mental Condition 4a:* If in Stage 2 the items recorded were *all six* of b c d e f g, then on sight of A the recollection will reproduce them all (subconsciously or otherwise), *i.e.* the correct sensation of identity, positive and complete, will take place, and *correctly;* whereas, on sight of B, having b c d m n p, the sensation of nonidentity will take place, and *correctly." Id.*

\* \* \*

*"Mental Condition 4b:* Now if in Stage 2 the memory record (or the original perception plus record) included *only* the items (say) b c d —, then the sight of *either A or B* (both of whom contain those three items) will produce a sensation of *identity,* because the sight of b or c or d will by association stimulate one or both of the remaining two items, and the sensation of identity will be more or less positive according to the number of items b c d originally recorded and revived; but if person A is the one shown, the recognition will be *correct,* while if person B is shown this recognition will be *incorrect."* Wigmore, *supra,* pp 535–536.

*   *   *

"Now Case *4b* is a *very common case.* The mind ordinarily retains only a few of the items marking a personality; moreover, it will ordinarily perceive only a few in the first place, and the number recorded and revivable will be still fewer. Hence, the danger in such a case of the observer perceiving B and receiving the sensation of his identity with A." *Id.*[18]

In conclusion, Wigmore points out another variable noted in *Wade* and *Simmons*—that the danger of misidentification increases with the degree of *similarity* in general appearance between the person seen previously and the person(s) now before you for scrutiny.[19] Complicating it further, as the degree of similarity and danger of misidentification increase together they carry along a greater feeling of *certainty* that you have made the right choice:

"Moreover, the *danger increases* in the *proportion of B's actual likeness to A,* while really a different individual. *E.g.* in the case above supposed, A's items were b c d e f g, and B's items were b c d m n p. But if B's items are b c d e f p, and thus five out of six marks are the same, the chances are increased that the observer will record some or all of marks b c d e f, which are the same for both A and B, and the

[18] See also Wall, p 10, quoting Burtt, *Applied Psychology* (2d ed 1957), p 250:

"The difficulty is that there may be certain elements in common between the original object and one which is incorrectly recognized as the original. If one object comprises ABCD and the other CDXY, the CD overlap is enough to mislead anybody."

The process has been explained in a similar fashion in most of the literature. See *e.g.,* Burtt, *Legal Psychology* (1931), p 94; *Safeguards Against Erroneous Identification, supra,* note 16, 237–238; Fogelson, *Control of Procedures for Identifying a Suspect,* 12 J For Sci 135 (1967); Dallet, Wilcox and D'Andrea, *Picture Memory Experiments,* 76 J Exper Psych 312 (1968); Gorphe, *Showing Prisoners to Witnesses for Identification,* 1 Revue Internationale De Criminalistique 165 (1929); translated and reprinted in 1 American J Police Science 79, 84 (1930).

[19] *Wade,* 233; *Simmons,* 383.

chances are reduced that his mind will record g, which is the only item different from B's item p."[20]

In sum, real prospects for error and suggestion inhere in the very process of "recognition" completely independent of the accuracy and completeness of perception or memory, and whether or not other suggestive influences are present. The importance of the process is that recognition depends upon similarity—degrees of unspecified sameness which become easily affected by suggestion. The identification resulting from even a recognition process unaffected by suggestion is worth no more than the correspondence between what is accurately recalled of the original object and what is perceived of the compared object. Because of the fallability of perception and memory, there may be very little real correspondence between the two, but an apparent correspondence, though wrong, can result in "identification".[21]

[20] Wigmore, *The Science of Judicial Proof* (1937), § 251, p 536. To the same effect: Feingold, *Influence of Environment, supra,* n 17; Rolph, *Personal Identity* (1957), p 42; Hunter, *Memory* (1957), pp 74–75; Brown, *An Experience in Identification Testimony,* 25 J Crim L & C 621 (1934–1935); Gardner, *The Perception and Memory of Witnesses,* 18 Cornell L Q 391, 401–402 (1933); Hutchins & Slesinger *Some Observations—supra,* n 14, p 868.

[21] Recent evidence suggests that face "recognition" is a special process in that we perceive and "code" faces partly on the basis of properties peculiar to people. That is, in addition to visual "cues" (eyes, hair, weight, etc.) we "code" attitudes, intentions, emotions, etc., as they appear in the face of the person perceived. See R. Yin, *Face Recognition: A Special Process?* (1970), pp 35–71. (Unpublished dissertation submitted to the Department of Psychology, Massachusetts Institute of Technology—also available in condensed form from the author at the New York City Rand Institute); Bradshaw & Wallace, *Models for Processing and Identification of Faces,* 9 Perception and Psychophysics 443 (1971); Hochberg & Galper, *Recognition of Faces: I. An Exploratory Study,* 9 Psychonomic Science 619 (1967). The evidence to date indicates that we go through the same mental *processes* of recognition, but we do it with a "coding" system more subtle and complex than with other objects such as houses, cars, etc. It is also found that we "recognize" *other objects* more accurately than faces in comparison tests. See R. Yin, *Face Recognition, supra.*

There is also evidence that people in general are more or less

## B. *PERCEPTION, MEMORY AND "INTERFER-ENCE"*

Reference has already been made above to the fact that a great number of variables will affect not only the accuracy of perception but also will influence the amount and substance of what is retained in memory. Other than such obvious factors as the physical defects an observer may have, the opportunity to observe, environmental conditions and the like, there are some factors affecting the accuracy of perception and memory worth noting briefly.[22]

"homogeneous", expecially some races vis-a-vis other races, although part of this is traceable to lack of frequent contact. Malpass & Kravits, *Recognition for Faces of Own and Other Race,* 13 J Personality & Social Psych 330 (1969); Feingold, *Influence of Environment, supra,* nn 117, 50; Seelemen, *The Influence of Attitude Upon the Remembering of Pictorial Material,* Archives of Psychology, #258 (1940); Engel, *Binocular Methods in Psychological Research,* in *Explorations in Transactional Psychology* (Kilpatrick ed 1961), pp 290, 303.

That these experiments may bear close scrutiny is evident from an earlier study indicating we have great difficulty recognizing faces alone. When subjects are forced to identify faces *independent* of other visual cues (such as same clothing, same expression, same "setting") *without suggestion* and with plenty of time for observation and *no* time delay before attempting recognition, they chose the wrong person 43% of the time. Howells, *A Study of Ability to Recognize Faces,* 33 J Abnormal & Social Psych 124 (1938).

[22] The sometimes incredible inaccuracy of perception has been demonstrated experimentally by psychologists in a great variety of situations. See *e.g.,* Marshall, *Law & Psychology in Conflict* (1966), pp 49–93; Yarmey, *Recognition Memory for "Familiar" Public Faces: Effects of Orientation & Delay,* 24 Psychonomic Sci 286 (1971); Vickery & Brooks, *Time-Spaced Reporting of a "Crime" Witnessed by College Girls,* 29 J Crim L, C & P S 371 (1938); Chenowith, *Police Training Investigates the Fallibility of the Eyewitness,* 51 J Crim L, C & P S 378 (1960). In Vickery & Brooks, *supra,* for example, the estimates of the height of the culprits ranged from 4' 8" to 7 feet tall. Estimates of weight ranged from 90 to 160 pounds and estimates of ages ranged from 11 years old to 20 years old. On the subject of perception, memory and psychological factors operating see generally:

Anastasi, *Fields of Applied Psychology* (1964); Allport, *Theories of Perception & the Concept of Structure* (1955); Atkinson & Walker, *The Affiliation Motive & Perceptual Sensitivity to Faces,* 53 J Abnormal Soc Psych 38 (1956); Bem, *Beliefs, Attitudes & Human Affairs* (1970); Britt, *The Lawyer and the Psychologist,* 36 Ill L Rev 621

1. There is a general unreliability of observation for *unexpected events.* A person is capable of grasping only a limited number of impressions at one time and his already limited range of accuity is aggravated when the event is unexpected. Experiments indicate that six to eight impressions are about the maximum of what an experienced observer can grasp of a single, sudden event.[23]

2. In *critical situations* perception will become distorted and any *strong* emotion (as opposed to mildly emotional experiences) will affect not only what and how much we *perceive,* but also will affect our *memory* of what occurred.[24]

(1942); Brown, Berrien & Russell, *Applied Psychology* (1966); Burtt, *Applied Psychology* (2d ed 1957); Burtt, *Legal Psychology* (1931); Degreer, *Anything But the Truth?, supra,* n 3; Dember, *The Psychology of Perception* (1960); *Explorations in Transactional Psychology* (Kilpatrick ed 1961); Feingold, *The Influence of Environment, supra,* n 17; Gardner, *Perception and Memory of Witnesses,* 18 Cornell L Q 391 (1933); Gibson, *The Perception of the Visual World* (1950); Granit, *Receptors & Sensory Perception* (1955); Gross, *Criminal Psychology* (1911), §§ 98–103; Hunter, *Memory* (1957); Kubie, *Implications for Legal Procedure of the Fallibility of Human Memory,* 108 U Pa L Rev 59 (1959); Kuraner, *The Consistency of Testimonial Accuracy,* 22 J Crim L & Criminology 406 (1931); Marshall, *Law & Psychology in Conflict* (1966); McCarty, *Psychology and the Law* (1960), pp 177–222; McKeever, *Psychology of Testimony,* 1 J Crim L & Criminology 930 (1911); Munsterberg, *On the Witness Stand, supra,* n 3; Munsterberg, *Psychology: General and Applied* (1923); *Readings in Social Psychology* (Maccoby, Newcomb & Hartley 3d ed 1958); Ryle, *The Concept of Mind* (1949); Soltis, *Seeing, Knowing and Believing* (1966); Wigmore, *The Science of Judicial Proof* (1937) §§ 150–151, 170–178, 180–188, 190–215.

[23] See, *e.g.,* Burtt, *Applied Psychology* (1957), p 244; Blom-Cooper & Wegner, *Psychological Selectivity in the Courtroom,* 8 Med Sci & L 31 (1968); Wall, pp 9–10; Munsterberg, *Psychology: General & Applied* (1923), p 400. In Burtt, *supra,* for example, the author gives the example of a witness in a sudden "raid" during which the lights were switched out. If the witness testifies about the behavior of more than a few people he has probably a much better imagination than memory.

[24] Wall, pp 16–17; Munsterberg, *Psychology: General & Applied* (1923), p 398; Berrien, *Practical Psychology* (rev ed 1952), p 491; Burtt, *Applied Psychology* (1957), pp 247–248; Borchard, *Convicting the Innocent* (1932), pp xiii, 84; Wigmore, *The Science of Judicial Proof* (1937), § 187; Kilpatrick, *Perception in Critical Situations,* in *Explorations in Transactional Psychology, supra,* n 22, p 319; Hunter,

Related to this is the effect of what is called *"retroactive inhibition"* and *"cerebral dysfunction".* Where a person has been in an experience coupled with high emotional stress and especially where there may have been blows to the head in an accident it is very commonly found that memory for the period just preceding the high stress or accident is blank or hazy at best. The generality of this effect, variously called as above or known as *"retrograde amnesia,"* has been well established.[25] The upshot of the evidence regarding the effect of emotion upon perception and recall is summed up well in Anastasi, *Fields of Applied Psychology* (1964), p 548:

> "Contrary to legal folklore, strong emotion at the time of observation or subsequent report tends to increase the probability of error."

3. Because of the limited range and accuity of perception, much of what we perceive is actually a result of *"filling in"* by *our imagination* in accordance with our *attitudes* and *expectations.*[26] This

---

*Memory* (1957), pp 64–65; Gardner, *Perception & Memory of Witnesses, supra,* n 22, p 396; Anastasi, *Fields of Applied Psychology* (1964), p 548.

[25] See, *e.g.,* Hunter, *Memory* (1957), pp 64–65; Munsterberg, *Psychology, supra,* n 22, p 398; Berrien, *Practical Psychology* (rev ed 1952), p 491; Burtt, *Applied Psychology* (1957), p 248.

.This explains the inability of the victim in our case to remember details just preceding and during the occurrence. In fact, if her memory was detailed and clear on how the car was stopped, etc., then we should be suspicious of her testimony. As one author observed:

"If testimony contains subtle details concerning an experience which was immediately followed by strong excitement, for instance, observations before an accident, the report of the witness is psychologically suspicious. It is probable that much of it consists of unintentional, imaginary additions." Munsterberg, *supra,* p 398.

[26] See, *e.g.,* Burtt, *Legal Psychology* (1931), pp 49–52; Ittelson, Wand & Slack, *The Perception of Persons as Visual Objects,* in *Person Perception & Interpersonal Behaviour* (Tagiuri and Petrullo eds 1958), p 210; Burtt, *Applied Psychology* (2d ed 1957), pp 249–250; Marshall, *Law & Psychology in Conflict* (1966), pp 12, 23–30, 51, 73;

propensity to supplement perception by "filling in" in accordance with our attitudes and expectations also has a pronounced effect upon *memory*. That is, even assuming a completely accurate perception, our memory will often be incomplete in fact but by the unconscious process of "filling in" we believe we remember things that we have only imagined. This tendency to *unconscious invention of memory* during the recall stage provides a fertile ground for suggestive influences however unintentional.[27]

4. The accuracy of what we perceive as well as what we remember of that perception will be distorted by a number of other factors such as *fatigue, nervous exhaustion, alcohol* and *drugs;*[28] the influences of *group pressures, "prestige"* or *"status"* persons and especially those groups, causes or persons with whom the witness is in some way *"identified";*[29] and the effect of princi-

Wigmore, *The Science of Judicial Proof* (1937), § 193, p 394; Hunter, *Memory* (1957), pp 84–85; Seeleman, *The Influence of Attitude Upon the Remembering of Pictorial Material,* Archives of Psychology #258 (1970); Rokes, *Psychological Factors Governing the Credibility of Witnesses,* Ins LJ 150, 151–152 (1968).

[27] The influence of imagination, bias and attitude on this perceptual "filling in" process takes on special significance for inter-racial perception. See *e.g.,* Pearlman & Oskamp, *The Effects of Picture Content & Exposure Frequency on Evaluations of Negroes & Whites,* 7 J Experimental and Soc Psych 503 (1971); Allport & Postman, *The Basic Psychology of Rumor,* in *Readings in Social Psychology, supra,* n 22, p 54.

[28] See *e.g.,* Munsterberg, *On the Witness Stand, supra,* n 22, pp 190–195; McCarty, *Psychology and the Law* (1960), p 209; Blom-Cooper & Wegner, *Psychological Selectivity, supra,* n 23, p 32.

[29] See *e.g.,* Asch, *Effects of Group Pressure on the Modification & Distortion of Judgments,* in *Readings in Social Psychology, supra,* n 22, p 174; Sherif, *Group Influences Upon the Formation of Norms & Attitudes,* in *Readings in Social Psychology, supra,* n 22, p 219; McCarty, *Psychology and the Law* (1960), p 209; Ittelson, Wand & Slack, *The Perception of Persons as Visual Objects, supra,* n 26; Marshall, *Law & Psychology in Conflict* (1966), p 68; Blom-Cooper & Wegner, *Psychological Selectivity, supra,* n 23, p 32; Hunter, *Memory* (1957), p 98.

ples of *Contiguity* (when two things are experienced together, the subsequent recurrence of one will tend to bring back the other), *Recency* (all things being equal, a most recent experience is better remembered than the more remote), *Primacy* (the tendency for the first association as well as the most recent to make a strong impression) and *Frequency* (if several things have been connected with another thing in the past, the one that has most frequently been connected in this way is most likely to recur).[30]

5. *The role of time is greatly misunderstood.* Although everyone knows that forgetting and time go hand in hand, it is not satisfactory to say that the *reason* we forget is time, because *time is not a causal agent.* Time does not enter as a factor in its own right, but merely permits a number of effective variables to operate, some of which have been discussed above. In general, and regardless of what of the variables are operating, *forgetting occurs rapidly* in a short interval after the incident to be remembered, becomes progressively slower and gradually levels off. This is described as the "curve of forgetting".[31]

Time allows for the operation of *interferring factors* between the particular activity and the occasion for remembering. The more similar the interpolated activity is to the original learning in substance and degree of sophistication, the greater the impairment in recall of the original material.

The amount of interference is also a function of the *amount* of interpolated activity, so *repeated*

[30] See *e.g.,* Burtt, *Legal Psychology* (1931), p 68 ff; Hunter, *Memory* 26–31 (1957); Gardner, *The Perception & Memory of Witnesses, supra,* n 22.

[31] See *e.g.,* Hunter, *Memory* (1957), pp 26–31, 61 ff; Marshall, *Law & Psychology in Conflict* (1966), pp 32, 75; Burtt, *Legal Psychology* (1931), p 86.

*interference* destroys memory as effectively as grossly misleading interpolated activity. An obvious factor that should not be underplayed is that the lesser the amount and accuracy of original learning, the more susceptible memory is to interference.

In short, forgetting is not so much a matter of "fading away" but of being crowded out by new impressions causing quantitative and qualitative changes in memory. Striking distortions in remembering may be produced by interpolated activity and material that is similar to the material originally perceived or learned.[32] The consequent inaccurate and altered memory of the witness at the time for identification magnifies the impact of the "recognition" process which, because it depends upon similarity,[33] is only as reliable and trustworthy as the memory of the identifying witness. It is during the retention period and at the occasion for identification or "recognition" that the most potent of distorting influences comes into play—suggestion.

## C. *SUGGESTION*

Both *Wade* and *Simmons* single out suggestive influences as a major factor contributing to the great number of misidentifications.[34] The authorities, including those cited in *Wade* and *Simmons* are unanimous that on top of the unreliability of sensation, perception and memory there is *"one factor which, more than anything else, devastates memory and plays havoc with our best intended recollections: that is, the power of suggestion".*[35]

---

[32] See Hunter, *Memory* (1957), pp 61–75.

[33] See discussion *supra,* pp 202–209.

[34] *Wade,* 228–229; *Simmons,* 383–384.

[35] Munsterberg, *On the Witness Stand, supra,* n 3, p 69 (emphasis

Suggestion may be implanted deliberately by over-zealous investigators, by a hint, impressive manner, gesture, tone of voice, facial expression or in other ways.[36] The rare case of intentional suggestion, however, is not our concern here but rather we are concerned with the probability of innocent suggestive influences from a host of sources. It would serve no useful purpose here and there is not sufficient space to catalog the many forms of subtle, unintentional suggestive influences. *Wade* and *Simmons* identify some of the most common ones.[37] The importance of the existence of so many possible forms of unintentional suggestion lies in the fact that *we are peculiarly susceptible to it* and the fact that it is an *unconscious process* so that we are *unable to detect its influence* while it operates.[38]

added). See also, Brown, *Legal Psychology* (1926), p 90 ("The principle cause of mistaken identification is probably suggestion"); Gardner, *Perception & Memory of Witnesses, supra*, n 22, p 401 ("Imagination and suggestion are twin-artists ever ready to retouch the fading daguerrotype of memory"); Houts, *From Evidence to Proof* (1956), p 11 ("The great weakness of identification evidence is that it is usually based on some form of suggestion."); Marshall, *Law & Psychology in Conflict* (1966), p 36 ("The impact of suggestion on recollection cannot be exaggerated."); Wall, pp 26, 68–73; Fogelson, *Control of Procedures for Identifying a Suspect,* 12 J For Sci. 135, 144 (1967); Berrien, *Practical Psychology* (rev ed 1952), pp 494–495; Burtt, *Legal Psychology* (1931), pp 101–144; Comment, *Possible Procedural Safeguards Against Mistaken Identification,* 2 UCLA L Rev 552, 553 (1955); Gorphe, *Showing Prisoners to Witnesses for Identification, supra,* n 18, p 85; McCarty, *Psychology and the Law* (1960), pp 209–212.

[36] See, *e.g., The Case Against Personal Identification,* 13 Ft Knightly L J 87, 88 (1943).

[37] *Wade,* 228–236; *Simmons,* 383–386. And see Wall, pp 26–89 and sources cited therein.

[38] See, *e.g., Safeguards Against Erroneous Identification, supra,* n 14, p 240; Munsterberg, *On the Witness Stand, supra,* n 3, pp 179–180:

"If a suggestion planted in a consciousness would remain there isolated, it would be easy to detect it. It would be in such manifold contradiction with all the normal reminiscences and habitual arguments that every court, for instance, would quickly recognize the strange thought as an intruder. *But just this is the uncanny power of*

Experiments by psychologists have repeatedly demonstrated the extent to which people are susceptible to suggestion.[39] One interesting test discussed in the opinion, graphically demonstrates the impact of even limited suggestion on the accuracy of a lineup identification. Brown, *An Experience in Identification Testimony*, 25 Crim L & Criminology 621 (1935). In another experiment an "assault" was staged in a law school class before 34 students. They were afterwards told to make notes and were given exact descriptions because they might have to testify in court. Five weeks later a seven-man lineup was held in which none of the "other" six closely resembled the "right" man. Result?—*Only 3 or 8.8% of the 34 students could pick out the right man.* Comment, *Possible Procedural Safeguards Against Mistaken Eyewitness Identification*, 2 UCLA L Rev 552 (1955).

## D. *COGNITIVE DISSONANCE*

Given the dangers of misidentification resulting from the vagaries of perception, memory, recognition and the impact of suggestion, it becomes important to understand another factor singled

*suggestion, that it at once infects all the neighbouring ideas and emotions and forces the whole mental life of the personality under the unnatural influence."* (Emphasis added.)

Marshall, *Law and Psychology in Conflict* (1966) p 42:

"With regard to criminal cases, reference has already been made to the suggestive effects of the police lineup in identification of suspects. In many instances the victim is especially susceptible to suggestions by the police or the district attorney because in his hostile state toward an offender he is eager to find a likely object for his hostility * * * ."

[39] See, *e.g.*, Munsterberg, *Id*, pp 180–181; *The Case Against Personal Identification, supra*, n 36; Burtt, *Legal Psychology* (1931), p 117; Hutchins & Slesinger, *Some Observations on the Law of Evidence—Memory*, 41 Harv L Rev 860, 869 (1928); Marshall, *Law & Psychology in Conflict* (1966), pp 68–70. Comment, *Possible Procedural Safeguards Against Mistaken Identification by Eyewitnesses*, 2 UCLA L Rev 552 (1955); and see sources cited in notes 21, 26, 27 & 29, *supra*.

out in *Wade* and *Simmons*—the effect upon a witness of having made an identification. Both *Wade* and *Simmons* recognize that the first identification may well be irreparable whether right or wrong because the witness who made that identification will be greatly influenced by what he then perceived and decided.

In *Wade* the Court said:

"Moreover, '[i]t is a matter of common experience that, once a witness has picked out the accused at the lineup, he is not likely to go back on his word later on, so that in practice the issue of identity may (in the absence of other relevant evidence) for all practical purposes be determined there and then, before the trial.' " *Wade,* 229.

In *Simmons,* Justice Harlan said:

"Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification." *Simmons,* 383–384.

This factor noted by the Court is a recognition of what psychologists refer to as "dissonance" theory. As one author puts it:

"[This theory] does not rest on the assumption that man is a rational animal; rather it suggests that man is a rationalizing animal—that he attempts to appear rational, both to others and to himself."[40]

The essence of the theory of cognitive dissonance is that before a decision is made, a subject knows certain factors and alternatives which he must

[40] Aronson, *Dissonance Theory: Progress and Problems,* in *Theories of Cognitive Consistency* (1968), pp 5–6.

weight to make the decision. The stronger the conflicts of a subject with respect to the alternatives in a decision process, the *greater* will his certainty be once the decision is made. In other words, the amount of "dissonance" existing *after* the decision is a function of the number of things the person knows that are inconsistent with the decision he has made. The greater the conflict before the decision, the greater the dissonance afterwards. Therefore, the more difficulty a person has making a decision, the greater is his tendency to justify that decision (reduce the dissonance) afterwards.[41]

[41] See, *e.g.,* Festinger, Riecken & Schachter, *When Prophecy Fails,* in *Readings in Social Psychology, supra,* n 22, p 156:

"A man with a conviction is a hard man to change. Tell him you disagree and he turns away. Show him facts or figures and he questions your sources. Appeal to logic and he fails to see your point. We are familiar with the variety of ingenious defenses with which people protect their convictions, managing to keep them unscathed through the most devastating attacks.

"But man's resourcefulness goes beyond simply protecting a belief. Suppose an individual believes something with his whole heart; suppose further that he has a commitment to this belief and that he has taken irrevocable actions because of it; finally, *suppose that he is presented with evidence, unequivocal and undeniable evidence, that his belief is wrong: what will happen? The individual will frequently emerge, not only unshaken, but even more convinced of the truth of his beliefs than ever before.* Indeed, he may even show a new fervor for convincing and converting other people to his view." (Emphasis added.)

Zimbardo, The *Cognitive Control of Motivation* (1969), p 272 notes studies on the phenomenon of dissonance reduction which:

"[H]ave repeatedly found that when a subject makes an immediate commitment to a given identification autonomic mobilization is in accord with the mistaken identification rather than with the nature of the stimulus; *the effect of the response overrides the effect of the true stimulus!*"

See also Festinger, *A Theory of Cognitive Dissonance* (1957); Festinger, *Conflict, Decision & Dissonance* (1964); Wall, pp 15–16, 68; Marshall, *Law and Psychology in Conflict* (1966), p 70.

A witness's *own* testimony about the independence of her in-court identification is almost meaningless and is clearly *not* a proper criterion under the *Wade* factors (p 241). See *Criminal Procedure— Lineups—Right to Counsel: "Independence" of In-Court Identification of Criminal Defendant from Previous Lineup Identification Inadmissi-*

It cannot be overemphasized that this apparent certainty of the witness after the decision is not the result of conscious or intentional suppression of countervailing factors. The *cognitive and recall processes actually change after a decision is once made* and we perceive the strength and weight of the alternatives that led to the decision much differently after we have made a decision:

"Once the decision is made and the person is committed to a given course of action, the psychological situation changes decisively. There is less emphasis on objectivity and there is more partiality and bias in the way in which the person views and evaluates the alternatives * * * ." Festinger, *Conflict, Decision & Dissonance* (1964), p 155.

## CONCLUSIONS

This brief survey of some of the psychological phenomena involved in eyewitness identification is intended only to aid an appreciation of the seriousness of the problem and its manifold causes. With this background, not only can we evaluate better the claims of parties relating to identification procedures, but also we have at least a starting point to evaluate proposals for alternatives to counsel.

T. E. Brennan, J. *(concurring)*. We granted leave in this case to review the validity of the procedures of photographic identification employed by the police.

My Brother's opinion concludes:

"Because of this evidence of the victim's knowledge before the suggestion took place viewed in combination with her previous acquaintance with defendant, we are satisfied that her in-court identification was accurate in

*ble Due to Absence of Counsel.—State v Redmond, 75 Wash Dec 2d 64; 448 P2d 938 (1968),* 45 Wash L Rev 202, 206 (1970).

spite of the employment of grossly suggestive proce-
dures calculated (albeit unintentionally) to prompt an
identification of whatever Indian was pictured."

Despite careful study, I can see no difference
between that conclusion and the conclusion
reached by the learned judge of the Court of
Appeals:

"An examination of the record in the present case
discloses that while the procedures followed in the
photographic display were suggestive, they were not
impermissibly so in light of complainant's prior oppor-
tunities to view defendant."

This, then, is the rule of law in the case, both in
the Court of Appeals and in this Court.

Where the victim was acquainted with her as-
sailant, and described him to the police, and was
in critical condition in the hospital, it was not
error to permit an in-court identification of the
defendant to be made, despite evidence that the
defendant was the only Indian among six persons
whose photographs were shown to the victim at
the hospital.

The balance of my Brother's opinion, though
scholarly and exhaustive, neither adds nor de-
tracts from the rule of law in the case.

If a Court is to avoid burdening the profession
with confusing *seriatim* opinions, it is necessary
for the Justices to ingest much unpalatable dicta.
Accordingly, I have signed my Brother's opinion.
But, if our opinions are to be of any value as
precedent, they should be limited to the enuncia-
tion of those rules of law which are decisional,
related to the facts in the case before us, and
supportive of the result arrived at.

LEVIN and M. S. COLEMAN, JJ., did not sit in this
case.